72 U.S. 62 (____)
5 Wall. 62
UNITED STATES
v.
WEED ET AL.
Supreme Court of United States.

*65 Mr. Ashton, Assistant Attorney-General, for the United States, appellants.
Mr. Coffey, contra, for the claimant.
*66 Mr. Justice MILLER delivered the opinion of the court.
If this case is to be disposed of here, upon the answer to be given to the question of prize or no prize, there can be no doubt that the decree of the District Court must be affirmed.
There can on the facts be no pretence that there was any attempt to break a blockade, nor can it be held that the cargoes were enemy property. No person hostile to the United States is mentioned in argument or otherwise as probable owner of any part of them. Can the places from *67 which the goods were brought impress upon them the character of enemy property? They were the products of those islands of Louisiana found in the bayous of that region, and were undoubtedly taken by the vessel from near the places of their production. These places, as we have seen, were under the military control of our authorities; and the parishes of St. Mary and St. Martin were then represented in a convention of loyal citizens, called to frame a constitution under which a government was organized for the State, hostile to the rebellion, and acceptable to the military commander of that department.
The regularly authorized agents of the Treasury Department were also issuing licenses to trade in these parishes, under the act of July 13th, 1861, and the regulations of the Treasury Department made under that act and other acts of Congress. It is not possible to hold, therefore, that property arriving from these parishes was, for that reason alone, to be treated as enemy property, in the sense of a prize court.
Whether it is liable to forfeiture for an illegal traffic, as being in violation of those regulations and acts of Congress, will be considered hereafter; but the question must be determined upon other considerations than those which govern a prize court.
The question of prize or no prize must therefore be answered in the negative.
But it is said, in behalf of the government, that if the property in controversy is not subject to condemnation as prize of war, it is liable to confiscation as having been purchased in violation of the acts of Congress, and the trade regulations established in pursuance of those acts.
Before entering upon this inquiry a preliminary question of some importance presents itself, which must be first disposed of.
The pleadings, the testimony, and the conduct of the case have been governed exclusively, from its commencement, upon the idea of prize proceedings. The libel is a very general allegation of property captured as prize. Not a word is found in the pleadings of the case which alleges any *68 fact rendering the property liable to confiscation under the acts of Congress. A large part of the testimony consists of depositions taken in preparatorio, where the claimants had no opportunity of cross-examination. If, under these circumstances, there is found in the testimony sufficient evidence to convince us that the property is liable to statutory confiscation, can we condemn it in this proceeding? Or, if we cannot condemn, must we, on the other hand, restore it to the claimants?
It would seem to violate all rules of pleading, as well as all the rules of evidence applicable to penal forfeitures, to hold that in such circumstances we can proceed to condemnation. The right of the claimant to be informed by the libel of the specific act by which he or his property has violated the law, and to have an opportunity to produce witnesses, and to cross-examine those produced against him, are as fully recognized in the admiralty courts, in all except prize cases, as they are in the courts of common law.
In the case of The Schooner Heppet,[*] the vessel was proceeded against for a forfeiture under the act to interdict commercial intercourse with France, and this court, by C.J. Marshall, says, that the first question made for its consideration is whether the information will support a sentence of condemnation. After stating the substance of the pleading, and the rule which governs the common law courts, he proceeds: "Does this rule apply to informations in a court of admiralty? It is not contended that all those technical niceties, which are unimportant in themselves, and standing only on precedents of which the reason cannot be discerned, should be transplanted from the courts of common law in a court of admiralty. But a rule so essential to justice and fair proceeding, as that which requires a substantial statement of the offence upon which the prosecution is founded, must be the rule of every court where justice is its object, and cannot be satisfied by a general reference to the provisions of the statute." He then asks if this defect of the *69 pleading can be cured by any evidence showing that in point of fact the vessel and cargo are liable to forfeiture and holds that it cannot.
In the case of The Brig Caroline,[*] this case is affirmed, and the principle applied to a libel filed against a vessel for violating the act of Congress concerning the slave trade.[]
The claimants, on the other hand, insist that as the evidence does not sustain a case within the prize jurisdiction of the court, the libel must be dismissed, and the property restored.
This might be true if the prize court of this country was a court sitting under a special commission, as it is in England, for that commission must then be the limit of its power. But such is not the case here. The District Court holds both its prize jurisdiction and its jurisdiction as an instance court of admiralty from the Constitution and the act of Congress, and it is but one court, with these different branches of admiralty jurisdiction, as well as cognizance of other and distinct subjects.
The case of Jecker v. Montgomery,[] in this court, is instructive, if not conclusive, on the point we are now considering.
In that case Captain Montgomery had, during the Mexican war, taken as prize the Admittance, an American vessel, and her cargo, for illegal trade with the enemy on the coast of California. He had carried his capture before a court claiming prize jurisdiction in that region, organized by the authority of the commanding general, and she was by that court condemned and sold. After this the owners of the vessel and cargo filed a libel in admiralty, in the instance side of the court, in the District of Columbia, against the captor; alleging that the capture was wrongful, and the condemnation illegal, and they prayed for restitution of their property, or that Captain Montgomery might be compelled *70 to bring the captured property into that court, or some other court of competent jurisdiction, and institute there the proper proceeding for its condemnation. Captain Montgomery answered, and insisted that his capture was lawful prize, and that the proceedings in the prize court in California were valid. Demurrers to the answer were filed, and on these pleadings the libel was dismissed.
On appeal to the Supreme Court, it was held that the prize court of California was without authority and its decree void. But, although the parties were before the court, and sufficient cause for the capture was stated in the answer, and sufficient excuse shown for not proceeding to a valid adjudication  all of which was admitted by the demurrer of the claimants  this court reversed the decree dismissing the libel, and remanded the case, with directions that the captor should institute proceedings in prize for the condemnation of his capture, and if he did not do so within a reasonable time the court should proceed against him on the libel of claimants for a marine trespass.
The court said that "the necessity of proceeding to condemnation in prize does not arise from any distinction between the instance court of admiralty and the prize court. Under the Constitution of the United States the instance court of admiralty and the prize court of admiralty are the same court, acting under one commission. Still, however, the property cannot be condemned as prize under this libel, nor would its dismissal be equivalent to a condemnation, nor recognized as such by foreign courts. The libellants allege that the goods were neutral, and not liable to capture, and their right to them cannot be divested until there is a sentence of condemnation against them as prize of war. And, as that sentence cannot be pronounced against them in the present form of the proceeding, it becomes necessary to proceed in the prize jurisdiction of the court, where the property may be condemned or acquitted by the sentence of the court, and the whole controversy finally settled."
In that case it was determined that the case must be remitted to the court in prize, because, under the libel and *71 mode of proceeding in the instance side of the court, the question of prize or no prize could not be definitely settled The case before us is the converse of that. We have here a case where all the proceedings are in prize, and according to the mode of proceeding in prize courts, but the case for the government, if it can be sustained at all, is not a case of prize, but of forfeiture under municipal law. We think the reasons are quite as strong why this court should not condemn the property in this proceeding, even if liable to forfeiture on the facts, as they are for refusing to condemn a prize on a libel filed on the instance side of the court. What, then, shall be done with the property, if the facts in the record prove a liability to forfeiture under the statute?
In the case of The Schooner Adelaide,[*] where this precise question was raised, it was not found necessary to decide it, because the proceeding being in prize, this court held that the facts proved it to be a prize case. But Mr. Justice Story, in delivering the opinion of the court, responding to the argument that the case was salvage and not prize, and therefore the libel should be dismissed, said: "If, indeed, there were anything in this objection, it cannot, in any beneficial manner, avail the defendants. The most that could result would be, that the case would be remanded to the Circuit Court, with direction to allow an amendment of the libel. Where merits clearly appear on the record, it is the settled practice in admiralty proceedings not to dismiss the libel, but to allow the party to assert his rights in a new allegation."
This practice was also followed in the case of Mrs. Alexander's Cotton.[] In that case the cotton had been libelled as prize of war. This court was of opinion that it was not a case of prize, but that it came within the statute covering captured and abandoned property. The court did not, for that reason, affirm the decree of the District Court, which had restored the property, or its proceeds, to Mrs. Alexander, but reversed that decree, and remanded the case to the District *72 Court, that it might dispose of the proceeds of the sale of the property, then in the registry, according to the opinion of the court.
Our inquiries into this subject, guided and supported by the decisions of this court, lead to the establishment of two propositions:
1. That when a case has been prosecuted as prize in the modes in use in the prize courts, which the facts in the record show not to be prize, but a case of forfeiture under statute, this court will remand the case for further proceedings in the court below.
2. That where a case has been in like manner prosecuted in the instance court, which, on the facts presented, this court is of opinion is a case for a prize court, it will be remanded for proceedings in prize.
We have already seen that the present is not, on the facts, a case of prize. The first of the above propositions establishes the rule that we cannot, under this proceeding, condemn the property for a forfeiture under the statute. It remains to be determined whether we shall affirm the decree of the District Court restoring the property, or remand the case for further proceedings on the question of municipal forfeiture. For this purpose we must examine, for a moment, the testimony before us.
We have already seen that the goods were purchased in those parishes of Louisiana which were occupied by our military forces, and which were under their control, and which were also represented in the effort to establish a loyal State government. It also appears that the legally appointed agents of the Treasury Department were in the habit of issuing permits to trade in those parishes.
The claimants allege that they made the purchases under licenses obtained from these agents, that they were fair and honest transactions, and that they themselves are loyal citizens of New Orleans. The facts of the purchase are stated with particularity, and under oath. The permits, or licenses, are produced and filed in court, and seem to us to be regular *73 in form and properly issued. It cannot be supposed that this court can take judicial notice of the varying lines of the Federal army of occupation in those remote regions, but the fact that the proper officers issued these permits for certain parishes, must be taken as evidence that they were properly issued, until the contrary is established. The facts, also, that the goods were brought in by a government vessel, for the use of which government received $3000, commanded by government officers, and guarded by government troops, ordered for the purpose by the post commander, are circumstances not to be disregarded in a matter of this kind.
It is objected that the permits were not found with the goods, as the regulations direct. This was merely directory, and would not of itself work a forfeiture of the goods. But they probably were on board with the goods when the latter were seized, and the holder of them may have felt justified in not delivering this evidence of his good faith to a gentleman who seemed willing to let the vessel do all she could in this traffic, so long as he could stand on the shore when she landed her goods, and seize them as prize of war.
It is said there is no proof identifying these goods as those purchased under the permits; but the affidavits of claimants are full to this point, and are uncontradicted by any testimony in the record. Other witnesses also prove the purchase and payment of these goods by Weed, about the time mentioned in the first of two permits issued to him.
It is said that Blydenburgh's permit was to purchase in the parish of St. Mary, and that his purchase was made in the parish of St. Martin. It is not shown precisely where the purchase was made. The sugar was taken from the shore of Grand River, a little below Butte la Rose. This Grand River seems to be the boundary between the parishes of St. Mary and St. Martin. However, there seems no reason to suppose that Blydenburgh intended to violate the terms of his permit, nor sufficient proof that he did so, in making his purchase. There is much contradictory testimony as to the existence of guerrillas near where the sugar was obtained about the time of its transportation; but this would seem *74 to show the necessity for its speedy removal, if the purchase had been honestly made.
On the whole, we see no reason to suppose that a case of forfeiture would be made out by the testimony on another trial, as much of that taken ex parte by the captors would probably be modified favorably for the claimants on cross-examination.
The decree of the District Court is therefore
AFFIRMED.
NOTES
[*] 7 Cranch, 389.
[*] 7 Cranch, 496.
[] See, also, The Samuel, 1 Wheaton, 9; The Mary Anne, 8 Id. 380.
[] 13 Heward, 498.
[*] 9 Cranch, 244.
[] 2 Wallace, 404.