## THE ITATA.

### UNITED STATES v. THE ITATA.

### SAME v. TWO THOUSAND CASES OF RIFLES.

(Circuit Court of Appeals, Ninth Circuit. May 8, 1893.)

### No. 45.

1. NEUTRALITY LAWS — FORFEITURE OF VESSEL—"FITTING OUT" FOR SERVICE AGAINST FOREIGN STATE.

Rev. St. § 5283, prescribing the forfeiture of any vessel which is furnished, fitted out, or armed with intent that she shall be employed against any foreign state or people with whom the United States are at peace, does not cover the case of a vessel which receives arms and munitions of war in this country with intent to carry them to a party of insurgents in a foreign country, but not with intent that they shall constitute any part of the fittings or furnishings of the vessel herself. 49 Fed. Rep. 646, affirmed.

2. SAME—PLEADING AND PROOF—VARIANCE.

Under a libel seeking the forfeiture of a vessel under Rev. St. § 5283, which forbids the fitting out and arming of a vessel in this country with intent that she shall be employed by any foreign state or people to cruise or commit hostilities against any state or people with whom the United States are at peace, the vessel cannot be condemned as piratical on the ground that she is in the employ of an insurgent party, which has not been recognized by our government as having belligerent rights. U. S. v. Weed, 5 Wall. 62, and The Watchful, 6 Wall. 91, followed.

Appeal from the District Court of the United States for the Southern District of California.

In Admiralty. Libels against the steamship Itata and her cargo for alleged violations of the neutrality laws. The court below dismissed the libels, (49 Fed. Rep. 646,) and the United States appeal. Affirmed.

W. H. H. Miller, Atty. Gen., Charles H. Aldrich, Sol. Gen., and Alexander Campbell and A. W. Hutton, Special Counsel, for the United States.

Charles Page, Stephen M. White, and George J. Denis, (Wm. W. Goodrich, of counsel,) for appellee.

Before GILBERT, Circuit Judge, and HANFORD and HAWLEY, District Judges.

HAWLEY, District Judge. These cases were tried together upon the evidence introduced in the district court in the case of U. S. v. Trumbull, 48 Fed. Rep. 99, so far as the same was applicable, and upon certain additional depositions. U. S. v. The Itata, 49 Fed. Rep. 647. A consideration of one case disposes of both.

On the 8th day of July, 1891, the United States attorney for the southern district of California filed a libel of information against the steamship Itata, alleging, in substance, (1) that on the 8th of May, 1891, within the limits of the United States, and within the jurisdiction of the court, one Pedro Manzen and divers other persons "did unlawfully fit out and arm said steamship or vessel called the Itata, with intent that such steamship or vessel should be employed in the service of certain foreign people, viz. certain inhabitants and citizens of the republic of Chile, then organized and banded together in large numbers and in great force, and engaged in open, armed hostilities and attempted revolution against the republic of Chile, and the lawful government thereof, said insurgents being known as the 'Congressional Party,' to cruise and commit hostilities against the citizens and property of a foreign state, viz. the republic of Chile, with which republic the United States were then and now are at peace;" (2) that on the 8th of May, 1891, within the limits of the United States, and within about two miles from the island of San Clemente, said persons "were unlawfully concerned in the furnishing and fitting out" of said steamship with the intent alleged in the first count; (3) that on the 6th day of May, 1891, within the limits of the United States, at the port of San Diego, in the state of California, said persons "were unlawfully concerned in the fitting out and furnishing of" said steamship with the same intent. All of which acts are alleged to be contrary to the form of the statute in such case made and provided, and that by force of the statute the said steamship Itata, her tackle, apparel, and furniture, "became and are forfeited to the uses in said statute prescribed." In due time the gobierno provisorio de la republica de Chile, as claimant of said steamship, filed an answer, specifically denying that the Itata was fitted out or armed, or furnished or fitted out, in any way as alleged in the libel, or for any purpose. It admits that at the date alleged the said vessel was in the service of the gobierno provisorio de la republica de Chile, or the provisional government of the republic of Chile, in said libel described as the "Congressional Party," and it avers that said government was and is the lawful government of said republic of Chile. It admits that said government was carrying on war, but it denies that said war was against the government or people of the republic of Chile. And it denies that the action of the said government, or said Pedro Manzen, or any person connected with said steamship, was or is against the form of the statute of the United States, or that by reason of any act of this respondent, or of said Manzen, or of any person connected with

said steamship, the same was or is forfeited. The statute in question reads as follows:

"Sec. 5283. Every person who, within the limits of the United States, fits out and arms, or attempts to fit out and arm, or procures to be fitted out and armed, or knowingly is concerned in the furnishing, fitting out, or arming of any vessel, with intent that such vessel shall be employed in the service of any foreign prince or state, or of any colony, district, or people, to cruise cr commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people with whom the United States are at peace, or who issues or delivers a commission within the territory or jurisdiction of the United States for any vessel to the intent that she may be so employed, shall be deemed guilty of a high misdemeanor, and shall be fined not more than ten thousand dollars, and imprisoned not more than three years. And every such vessel, her tackle, apparel, and furniture, together with all materials, arms, ammunition, and stores, which may have been procured for the building and equipment thereof, shall be forfeited,—one-half to the use of the informer, and the other half to the use of the United States."

## The facts found by the district court are as follows:

"In January of 1891 the steamship Itata was an ordinary merchant vessel. Early in that month she was captured in the harbor of Valparaiso, Chile, by the people then known as the 'Congressional Party,' and who were then engaged in an effort to overthrow the then established and recognized government of Chile, of which Balmaceda was the head. The Itata was by the Congressional party put in command of one of its officers, and was used in their undertaking as a transport to convey troops, provisions, and munitions of war, and also as a hospital ship, and one in which to confine prisoners. Four small cannon were also put upon her decks, and she carried a jack and pennant. Some time prior to the following April, one Trumbull came to the United States as an agent of the Congressional party, and about the month of April went to the city of New York, and there bought from one of the large mercantile firms of that city dealing in such matters 5,000 rifles and 2,000,000 cartridges therefor, with the intention and for the purpose of sending them to the Congressional party in Chile for use in their effort to overthrow the Balmacedan government. The sale and purchase of the arms and ammunition were made in the usual course of trade. Trumbull caused them to be shipped by rail to San Francisco, and engaged one Burt to accompany them, which he did. Arrangements had been made by Trumbull with his principals in Chile by which they were to send a vessel to the United States to get the arms and ammunition, and convey them to Chile for the use of the Congressional party there. The Itata was dispatched by that party for that purpose, and was accompanied as far as Cape San Lucas by the Esmeralda, a warship then in the service of the Congressional party. Before leaving Chile, the Itata discharged the four small cannon, with the ammunition therefor, that she had theretofore carried, but she retained one small, brass gun, which she had always carried and used as a signal gun, and also eight or ten old muskets, and one small iron cannon, for which there was no ammunition. At one of the Chilean ports the Itata took on board some soldiers, with their arms, not exceeding 12 in number; but they were taken, not to be used as soldiers, but for passing coal and as stokers. At San Lucas the captain of the Esmeralda took command of the Itata, and the captain of the latter was left there in command of the Esmeralda. The Itata then proceeded to San Diego, really in command of the Esmeralda's captain, but ostensibly in command of another, who represented to the customs officers at the port that she was an ordinary merchantman, and was bound to some port on the northern coast. Before coming into the port of San Diego, or into the waters of the United States, the Itata hauled down her jack and pennant; the brass and iron cannon were removed from her deck, and stowed in her hold, as were also the arms of the soldiers she carried; and their uniforms, as well as those of the officers, were removed, and all appeared in civilian's dress. At that port she laid in stores of coal and provisions, all of

which were bought in the open market, and some of which were marked 'Esmeralda.' Meanwhile Trumbull had chartered a schooner, called the Robert and Minnie, in San Francisco, to take the arms and ammunition from there to a point in this judicial district, then expected to be near the island of Catalina, where she could meet the Itata, and deliver them on board of her, to be conveyed to Chile for the purposes already stated. The schooner Robert and Minnie accordingly took on board the arms and ammunition at the port of San Francisco, and, in charge of Burt, proceeded to the neighborhood of Catalina island, where she expected to meet the Itata. In the mean time the suspicion of some of the officers of the United States that the neutrality laws were being violated was aroused, and the marshal of this district was directed by the attorney general to detain the Itata if such was found to be the case; and, acting upon those and certain instructions from the district attorney of this judicial district, he went on board the ship at San Diego, and put a keeper in charge of her, and then went in search of the Robert and Minnie, which he did not find in the waters of the United States. Communication was, however, had between the Itata and the schooner, and a point near San Clemente island was fixed upon as the place of meeting for the purpose of transferring the arms and ammunition from the schooner to the ship. Accordingly, the Itata, on the 6th day of May, 1891, without obtaining clearance papers, and against the protest of the person left on board and in charge of her by the marshal, weighed anchor, and steamed out of the harbor of San Diego, with him on board, to meet the Robert and Minnie, and receive the arms and ammunition. The marshal's keeper was, however, put ashore at Point Ballast, before leaving the harbor. While steaming out of it, one or both of the Itata's cannon were brought on deck, and some of the soldiers on board of her appeared in uniform. On the 9th of May the Itata and Robert and Minnie came together about a mile and a half southerly of San Clemente island, in this judicial district, and there the arms and ammunition in question were taken from the schooner and put on board the ship in original packages, and the latter at once left with them for Chile. On September 4, 1891, the Congressional party was recognized by the government of the United States as the established and only government of Chile. Prior to that time there had been no recognition of that party by this government, other than that on March 4th the secretary of the navy cabled Admiral McCann 'to proceed to Valparaiso, and observe strict neutrality, and take no part in troubles between parties, further than to protect American interests.' On March 26th the secretary of the navy cabled Admiral Brown, who had superseded Admiral McCann, 'to abstain from proceedings in nature of assistance to either,—that is, the Balmaceda or Congressional party; that the ships of the latter were not to be treated as piratical so long as they waged war only against the Balmaceda government.' On April 25th, Secretary of State Blaine cabled the American minister: 'You can act as mediator with Brazilian minister and French charge d' affaires.' On May 5th, Minister Egan cabled this government: 'Government of Chile and revolutionists have accepted mediation of the United States, Brazil, and France most cordially; those of England and Germany declined.' On May 7th, Acting Secretary of State Wharton acknowledged the dispatch of Minister Egan, and 'expressed hope that, through combined efforts of governments in question, the strife which has been going on in Chile may be speedily and happily terminated.' On May 14th, Acting Secretary of State Wharton cabled Minister Egan that 'French Minister reports threats to shoot the insurgent envoys by Balmaceda,' and directed that they should have ordinary treatment under flag of truce."

The contention of appellee is (1) that the Itata was not fitted out and armed, or furnished and fitted out, to cruise or commit hostilities, but, on the contrary, she was a merchant vessel, engaged at the times referred to in the libel in the exercise of a lawful pursuit; (2) that if the Itata was fitted out and armed, or furnished and fitted out, such acts were not done with intent that she should

be "employed in the service of any foreign prince or state, or of any colony, district, or people, to commit hostilities;" (3) that the case made by the evidence is not within the statute; (4) that the subsequent recognition by the United States of the provisional government as the lawful government of Chile was, in legal effect, a recognition of all its prior governmental acts as the acts of a sovereign government.

It was conceded in the oral argument by the special counsel for the appellants, and we do not understand the attorney general, in his brief, to deny it, that Trumbull, acting as an agent for the Congressional party in Chile, had the lawful right to purchase the arms and ammunition in the United States; that this was purely a commercial transaction recognized by law. But it is claimed that, notwithstanding the fact that the purchase of the arms and ammunition was legal, yet the shipment of them for the purpose of being conveyed to Chile, there to be surrendered to the Congressional party for the purpose of being used by that party in a war against the Balmaceda government of Chile, which at that time was recognized by the United States as the lawful government of Chile, was an unlawful act, which justified the libel, and warranted a decree of court for the forfeiture of the vessel. If this contention is correct, it settles the controversy, for there can be no doubt but what the intent and purpose of the Itata, and of the persons having her in charge, was to convey the arms and ammunition out of the United States and to Chile, there to be delivered to the Congressional party for the purpose above stated.

If the Congressional party, as insurgents, are to be treated as belligerents, they not only had the right to buy the arms and ammunition in the United States, but they also had the right to ship them at their risk, subject only to the penalties of confiscation which the laws of war authorize. Commercial dealings or transactions are not proscribed by the laws of nations as violations of neutral territory simply because they are contraband of war. "It was contended on the part of the French nation, in 1796, that neutral governments were bound to restrain their subjects from selling or exporting articles contraband of war to the belligerent powers. But it was successfully shown on the part of the United States that neutrals may lawfully sell, at home, to a belligerent purchaser, or carry themselves to the belligerent powers, contraband articles, subject to the right of seizure in transitu. This right has since been explicitly declared by the judicial authorities of this country." 1 Kent, Comm. 142; The Santissima Trinidad, 7 Wheat. 283; The Bermuda, 3 Wall. 514; Richardson v. Insurance Co., 6 Mass. 113. In a letter written by Attorney General Lee to the secretary of state in 1796 it is said: "That an enemy may come into the territory of a neutral nation, and there purchase and thence remove any article whatever, even instruments of war, is a law of nations, long and universally established." 1 Op. Atty. Gen. 61. In 1865 Attorney General Speed, in a letter to the secretary of state, said: "I know of no law or regulation which forbids any person or government, whether the political designation be

real or assumed, from purchasing arms from citizens of the United States, and shipping them at the risk of the purchaser." 11 Op. Atty. Gen. 452. In 1871, Attorney General Ackerman, in a letter to the secretary of state,[1] replying to a communication which had been received from the Spanish minister in relation to the expedition of the Hornet to the coast of Cuba, said: "Assuming the credibility of the sworn statements which he has transmitted, I do not think that they prove against the Hornet any violation of the neutrality laws of the United States. They show that the Hornet conveyed from Aspinwall to the coast of Cuba men, arms, and munitions of war, destined to aid the Cuban insurgents. This proof, by itself, does not bring the vessel within the third section of the neutrality act of April 20, 1818." 3 Stat. 448. See, also, letter of Mr. Pickering, secretary of state, to the minister of France, 1 Amer. St. Papers, 649; letter of Attorney General Rush to the president in 1816, 1 Op. Atty. Gen. 190; letter of Attorney General Speed to the secretary of state in 1865, 11 Op. Atty. Gen. 408; 3 Whart. Int. Law Dig. § 391, p. 515.

But the argument of the attorney general in support of his contention is to the effect that, the United States not having done any act tending to accredit the rebellion in Chile, the Congressional party had no belligerent rights; that all warlike acts conducted by them "upon the ocean bore the legal character of piracy, and upon land that of robbery;" that it was not the duty of the United States, under the rules of international law, to accord to them the same privileges as to the recognized government of Chile; and that there could not be any legitimate trade or commerce with such people until the government of the United States had recognized the insurgents as belligerents. The law is well settled that it is the duty of the courts to regard the status of the Congressional party in the same light as they were regarded by the executive department of the United States at the time the alleged offenses were committed. Gelston v. Hoyt, 3 Wheat. 246; U. S. v. Palmer, Id. 610; Kennett v. Chambers, 14 How. 51; The Ambrose Light, 25 Fed. Rep. 409. It being admitted that the government of the United States, at the time of the commission of the alleged unlawful acts, had not recognized the congressional party as being entitled to any belligerent rights, it would seem to follow that it was within the power of the government, at its option, to treat the party as pirates if the facts warranted it, and justice and policy so required. 3 Whart. Int. Law Dig. § 381, p. 466.

This view of the case presents the question whether section 5283 of the Revised Statutes has any application to persons or vessels whom it is optional with the United States to treat as pirates. If the statute was only intended to apply to cases of neutrality between two recognized belligerent countries, it would not, under the theory advanced by appellant's counsel, have any application to this case, because, as they contend, there is "no question of neutrality, as that term is known in international law,

[1] 13 Op. Atty. Gen. 541.

which only exists between the belligerents,—a status composed of a rightful belligerent power or a de facto belligerent force, made so by recognition." We do not deem it necessary to decide the question as to the meaning of the statute in relation to this particular subject, but we do consider it proper that a reference should be made to the authorities in relation to this matter, as shedding some light, and making clearer the principles that will be discussed in relation to other questions upon which our decision will be based.

In the oral argument of counsel there was an extended discussion as to the proper meaning of the word "people" as used in the statute. This word is a comprehensive one, and is, of course, subject to many different meanings, depending always upon the connection in which it is used, and the subject-matter to which it relates. The definition given in And. Law Dict. is: "Ordinarily, the entire body of the inhabitants of a state. In a political sense, that portion of the inhabitants who are intrusted with political power." And in Rap. & L. Law Dict., among other definitions: "The state or nation in its collective or political capacity." In Nesbitt v. Lushington, decided in 1792, involving the construction of a marine insurance policy, wherein liability was sought to be avoided under a clause of exceptions in the event of "arrests, restraints, and detainments of all kings, princes, and people of what nature, condition, or quality soever," and the meaning of the word "people" as used in that clause was passed upon, "it appeared in evidence that the ship was forced by stress of weather into Elly harbor, in Ireland; and, there happening to be a great scarcity of corn there at that time, the people came on board the ship in a tumultuous manner, took the government of her from the captain and crew, and weighed her anchor, by which she drove on a reef of rocks, where she was stranded." Lord Kenyon, C. J., said: "That which happened in this case does not fall within the meaning of arrests, restraints, and detainment of kings, princes, and people. The meaning of the word 'people' may be discovered here by the accompanying words; noscitur a sociis. It means the ruling power of the country." 4 Term R. 787. These definitions seem to be applicable to this case.

While the statute is penal and criminal in its nature, and should be strictly construed, still no technical view resting solely upon the narrow or limited meaning of any particular word should be adopted if, by the entire context, a different meaning appears to have been intended. The mere fact that the section in question is found under a heading designated by the title of "Neutrality" is not of itself controlling. The section should be construed in connection with, and in the light of, other provisions in other parts of the statute in relation to international subjects, although such statutes may be classed under different headings, provided that, in the absence of such a division and classification, a comparison of all such provisions would be proper. End. Interp. St. § 70, and authorities there cited. The causes which led up to the passage of the act "for the punishment of certain crimes

against the United States," (1 Stat. 381,) generally called the "Neutrality Act," are set forth at great length in note 215 to section 439, Wheat. Int. Law. The third section, as originally enacted June 5, 1794, had the words: "With intent that such ship or vessel shall be employed in the service of any foreign prince or state, to cruise or commit hostilities upon the subjects, citizens, or property of another foreign prince or state with whom the United States are at peace." In 1818, from a suggestion of the Spanish minister that the South American provinces in revolt, and not recognized as independent, might not be included in the word "state," the words "colony, district, or people" were added. The discussions which were had were in reference to the better preservation of neutrality, and in furtherance of the obligation of the United States as a neutral power.

In Gelston v. Hoyt, 3 Wheat. 323, the court discussed the meaning of the third section of the statute as originally enacted. "The evidence offered and rejected was to prove that the ship was attempted to be fitted out and armed, and was fitted out and armed, with intent that she should be employed in the service of that part of the island of St. Domingo which was then under the government of Petion, to cruise and commit hostilities upon subjects, citizens, and property of that part of the island of St. Domingo which was then under the government of Christophe," and the court held that no forfeiture could be incurred unless Petion and Christophe "were foreign princes, within the purview of the statute," and sustained the action of the court below in rejecting the evidence offered, upon the ground that "neither the government of Petion nor Christophe have ever been recognized as a foreign state by the government of the United States or of France."

In U. S. v. Quincy, 6 Pet. 467, the court, in construing the provisions of the third section, as amended April 20, 1818, (section 5283, Rev. St. U. S.,) said:

"The word 'people,' as here used, is merely descriptive of the power in whose service the vessel was intended to be employed; and it is one of the denominations applied by the act of congress to a foreign power."

In The Carondelet, 37 Fed. Rep. 800, Brown, J., said:

"Section 5283 is designed in general to secure our neutrality between foreign belligerent powers. But there can be no obligation of neutrality except towards some recognized state or power, de jure or de facto. Neutrality presupposes at least two belligerents; and, as respects any recognition of belligerency, i. e. of belligerent rights, the judiciary must follow the executive. To fall within the statute the vessel must be intended to be employed in the service of one foreign prince, state, colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of another with which the United States are at peace. The United States can hardly be said to be at peace, in the sense of the statute, with a faction which they are unwilling to recognize as a government; nor could the cruising or committing of hostilities against such a mere faction well be said to be committing hostilities against the subjects, citizens, or property of a district or people, within the meaning of the statute. So, on the other hand, a vessel, in entering the service of the opposite faction of Hippolyte, could hardly be said to enter the service of a foreign prince or state, or of a colony, district, or people, unless our government had recognized Hippolyte's

faction as at least constituting a belligerent, which it does not appear to have done."

Opposed to these authorities is the letter of Attorney General Hoar to the secretary of state, December 16, 1869, wherein he said:

"Undoubtedly the ordinary application of the statute is to cases where the United States intends to maintain its neutrality in wars between two other nations, or where both parties to a contest have been recognized as belligerents; that is, as having a sufficiently organized political existence to enable them to carry on war. But the statute is not confined in its terms, nor, it seems to me, in its scope and proper effect, to such cases. Under it, any persons who are insurgents, or engaged in what would be regarded under our law as levying war against the sovereign power of the nation, though few in number, and occupying however small a territory, might procure the fitting out and arming of vessels with intent to cruise or commit hostilities against a nation with which we were at peace, and with intent that they should be employed in the service of a colony, district, or people not waging a recognized war." 13 Op. Atty. Gen. 179.

In The Salvador, L. R. 3 P. C. 218, cited by appellants, the language of the foreign enlistment act, (59 Geo. III. c. 69, § 7,) referred to in the opinion, is much broader in its terms than is the language of section 3 of the neutrality act of the United States. That act reads: "In the service of any foreign prince, state, or potentate, or of any foreign colony, province, or part of any province or people, or of any person or persons exercising or assuming to exercise any powers of government in or over any foreign state, colony, province, or part of any province or people." It was held that the case of The Salvador came within the alternative of section 7, "because their lordships found these propositions established beyond all doubt. There was an insurrection in the island of Cuba. There were insurgents who had formed themselves into a body of people, acting together, undertaking and conducting hostilities. These insurgents, beyond all doubt, formed part of the province or people of Cuba, and beyond all doubt the ship in question was to be employed, and was employed, in connection with and in the service of this body of insurgents."

With this review of the authorities we proceed to a consideration of what we deem to be the controlling question in this case, viz. is the evidence sufficient to sustain the libel? The offense, if any was committed, depends, to a great extent, upon the preparations made on board the Itata while within the limits of the United States. It is, of course, proper to consider what preparations were made, and what acts were performed, prior to her arrival within the limits of the United States, and her conduct, and the conduct of those having her in charge, after she departed from such jurisdiction, for the purpose of explaining or ascertaining the object which she had in view in coming within the limits of the United States, and her object in taking the arms and ammunition aboard; but her guilt or innocence must be determined by the acts performed and the purpose she had in view while within the limits of the United States. This is the material question upon which the legality or criminality of the acts of the Itata must be decided, and the true character of her adventure determined.

"As has been often said, the intent described in this statute is a necessary ingredient of the offenses created, in the absence of which no crime is committed, nor any forfeiture incurred. The crime necessary to be shown in order to forfeit the ship consists of an act done within the limits of the United States, when done with that intent, namely, the intent that the vessel in connection with which the act is done shall be employed in the service of some foreign prince or state, or colony, district, or people, as a cruiser or committer of hostilities against the subjects, citizens, or property of some foreign prince or state, or colony, district, or people, with whom the United States are at peace." The Conserva, 38 Fed. Rep. 436. The testimony in this case, and the findings of the court thereon, in our opinion, clearly show that the Itata was not a war vessel; that she was not fitted out and armed, or attempted or procured to be fitted out and armed, or furnished and fitted out with intent to cruise or commit hostilities of any kind. The arms and ammunition that were taken from the Robert and Minnie and put on board the Itata were not intended for use by her for the purpose that she should be engaged in cruising or committing hostilities against the recognized government of Chile as charged in the libel. All the facts, which are clearly and fully presented in the findings of the district court, show that the arms and ammunition were put on board the Itata with the intent, object, and purpose to have them transported to Chile for the use of the Congressional party, and not with any intent that the Itata as a war vessel should in any manner be employed to cruise or commit hostilities against the government of Chile, with whom the United States were then at peace.

The cases relied upon by appellants to justify the libel in this case upon the ground that the United States had the right to treat the Itata as a pirate are not in point. In the first place, the libel was not instituted against the Itata on the ground that she was depredating upon the high seas, without authority from any sovereign power. "The libel for prize is founded upon the law of nations, and depends for proof upon the facts of her acts upon the high seas. The libel for forfeiture is for the violation of a municipal statute, and depends upon a set of facts and circumstances entirely different from that of piratical aggression. The offenses charged are separate and distinct, and the cause of action is in no wise the same." The City of Mexico, 28 Fed. Rep. 150. In U. S. v. Weed, 5 Wall. 62, where all the pleadings, testimony, and conduct of the case had been governed exclusively from its commencement upon the idea of prize proceedings, the court held that the property could not be condemned as for a statutory forfeiture, and that, where the case is prosecuted for forfeiture under a statute, it could not, in the appellate court, be considered as prize. In that case there was nothing in the pleadings which alleged any fact rendering the property liable to confiscation under the acts of congress. The court said:

"It would seem to violate all rules of pleading, as well as all the rules of evidence applicable to penal forfeitures, to hold that in such circumstances we can proceed to condemnation. The right of the claimant to be informed

by the libel of the specific act by which he or his property has violated the law, and to have an opportunity to produce witnesses, and to cross-examine those produced against him, are as fully recognized in the admiralty courts, in all except prize cases, as they are in courts of common law."

Under that decision and The Watchful, 6 Wall. 91, when a ship is libeled for prize, and the facts fail to sustain the libel, but make out a strong prima facie case of a statutory forfeiture, it would be the duty of the court to remand the case for a new libel; but under no circumstances could a ship be libeled for one offense, and have a decree entered against it for another distinct and separate offense.

In the next place, the facts are totally dissimilar. In the case of The Ambrose Light, 25 Fed. Rep. 408, upon which great reliance is based, the libel was filed to procure the condemnation as prize of the brigantine Ambrose Light, which was navigating as a Colombian vessel of war in the waters touching the coast of the United States of Colombia in the Atlantic ocean. She was engaged upon a hostile expedition against Cartanegra, and designed to assist in the blockade and siege of that port by the rebels against the established government of the United States of Colombia. She belonged to Colente, one of the chief military leaders of the insurgents at Barranquilla. The legality of the seizure depended upon the answer to be given to the inquiry whether the cruise of the vessel under the commission of the insurgent leaders to assist in the so-called "blockade of Cartanegra" was to be regarded, under the circumstances of the case, as lawful warfare or piratical. The conclusion of the court was "that the liability of the vessel to seizure as piratical turns wholly upon the question whether the insurgents had or had not obtained any previous recognition of belligerent rights, either from their own government or from the political or executive department of any other nation; and that, in the absence of recognition by any government whatever, the tribunals of other nations must hold such expeditions as this to be technically piratical."

Why? Because in such a case it necessarily follows, as the court said, "that, in the absence of recognition by any government of their belligerent rights, insurgents that send out vessels of war are, in legal contemplation, merely combinations of private persons engaged in unlawful depredations on the high seas; that they are civilly and criminally responsible in the tribunals for all their acts of violence; that in blockading ports which all nations are entitled to enter they attack the rights of all mankind, and menace with destruction the lives and property of all who resist their unlawful acts; that such acts are, therefore, piratical, and entitle the ships and tribunals of every nation whose interests are attacked or menaced to suppress, at their discretion, such unauthorized warfare by the seizure and confiscation of the vessels engaged in it." There is no foundation for the application of such principles to a case like this, where the alleged offending ship was not a war vessel, and had done no act connected with her voyage that indicated that she had attacked, or intended to attack, any nation, or anybody, upon the high seas or on land, or to engage in any warfare of any kind.

The argument of counsel for the United States in the Alabama Case, (3 Geneva Arbitration, 8, 9,) which is relied upon and quoted at length in the brief of the attorney general, had reference to the facts of that case. The Alabama was fitted out and armed in British territory, with intent to go on a cruise, and commit hostilities against the subjects, citizens, and property of a friendly nation. Moreover, that case was tried upon three rules, which were agreed upon between the two countries, England at the time denying that the rules correctly stated the law of nations, but consenting to be bound by them in that particular case. Dr. Wharton, in his notes to a chapter on "Breach of Neutrality," which was to the effect "that it is no breach of neutrality for the subjects of a neutral state to furnish to a belligerent munitions of war," (2 Whart. Crim. Law, § 1903,) said:

"It may be said that the three rules adopted by the treaty of Washington for the guidance of the Alabama arbitrators modify the conclusions of the text. Those rules are considered at large in the discussion of this topic by Mr. W. B. Lawrence, with which this chapter closes. So far as concerns the particular point in the text, it may be maintained that the conclusions of international law in this respect are not effected by the 'three rules,' for the following reasons: (1) These rules are only to be binding as rules of international law if accepted by the leading powers, which they have not been. (2) They are not binding as permanent and absolute rules on England and the United States, (a) because neither England nor the United States have ever considered them to be so binding; and (b) because by the treaty that proposed them, as temporary rules of action, for guidance of a special and exceptional court, their permanent adoption is dependent upon their communication to the great European powers, which communication has never been made. This position is taken by Mr. Fish in his letters to Sir Ed. Thornton, of May 8 and September 18, 1876, as communicated by President Hayes in his message to the senate, of January 13, 1879; and there is no dissent of the British government recorded."

In the notes referred to, written by Mr. W. B. Lawrence, it is said:

"The condition of belligerency would be infinitely preferable to that of neutrality, as defined by the conference of Geneva; and the due diligence prescribed would compel the United States, whenever they were neutrals, to maintain a naval police competent to cope with any belligerent forces throughout the whole extent of our coasts, both on the Atlantic and Pacific. By the repudiation of the three rules by their authors we are remitted to laws of neutrality as understood before the attempt to define neutral obligations by municipal or conventional laws." 2 Whart. Crim. Law, § 1908, p. 664.

In The City of Mexico, supra, there were two libels,—one for prize, which was dismissed, because the evidence offered failed to sustain it; the other was for the forfeiture of the ship for a violation of a municipal statute embodied in section 5283, Rev. St. In the course of the opinion it is said:

"It is true that vessels may frequently be engaged in transporting troops as passengers, and war material as freight, without themselves having any connection with the actual hostilities contemplated, so that their voyages in no way partake of the nature of hostile acts, nor they be liable to be charged with the commission of hostilities."

There was testimony given by a number of the crew that "they were going to Honduras, and were to fight." The decision in the case turned upon the conclusions of the facts by the court "that

acts of hostility were contemplated and intended at the time of furnishing and fitting out the City of Mexico, in which she was to take an active part, and that it was intended that she should receive arms and ammunition, and, in the language of the statutes, she should commit hostilities." And it was upon this conclusion that the decree of forfeiture was entered.

The case of U. S. v. 214 Boxes, 20 Fed. Rep. 50, was dependent upon the facts presented in The City of Mexico. The case of The Mary N. Hogan, 18 Fed. Rep. 529, was similar in its facts. The Mary N. Hogan was not a war vessel, but there was testimony upon the part of the crew that "they were going to fight Hayti, and would take in arms on the way." The testimony was of such a character as to show to the satisfaction of the court that she was intended to be used for "such hostile demonstrations as she was fit to make against the defenseless ports of the coast."

It will thus be seen that the cases relied upon are clearly distinguishable from the case of the Itata. It is true that in this case there were criminating circumstances sufficient to arouse suspicion as to a hostile intent on the part of the Itata. The sending of the war ship Esmeralda as a convoy for a part of the way, the Itata being under the command of a captain of the navy, with soldiers, cannon, and muskets on board; the concealment of the cannon; the change of dress of a part of the crew; the failure to give the bond required by law; the circuitous methods adopted to take the arms and ammunition from the schooner Robert and Minnie,— are all proper circumstances to be considered, and were perhaps sufficient to cast the burden of proof upon the Itata to establish her innocence by showing, as she did, that, notwithstanding these suspicions and criminating circumstances, she was not a war vessel; that she had done nothing, and did not intend to do anything, contrary to the provisions of section 5283; that she was not fitted out or armed, or attempted to be fitted out or armed, or procured to be fitted out or armed or furnished, with intent that she should be employed "in the service of any foreign prince or state, or any colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people, with whom the United States were at peace."

The case of The Florida, 4 Ben. 452, was a libel against the vessel for an alleged forfeiture claimed to have been incurred by a violation of section 5283 of the Revised Statutes, and in its facts bears a closer analogy to the facts of this case than any of the other cases to which our attention has been called. The court said:

"Admitting that persons acting as agents of the insurrectionary party in Cuba were the real owners of the vessel and her cargo of arms and munitions of war, and that the transaction of the borrowing, by Darr from Castillo, of the money wherewith the vessel and her cargo were purchased, was a sham, and that the vessel was to proceed with her cargo to Vera Cruz, and there the vessel and cargo were to be transferred by Darr, their nominal owner, to persons acting for the insurrectionary party in Cuba, and that thence the vessel was to take the cargo to some point off the coast of Cuba, and land

it on the shore by the use of rafts made out of the lumber on board, towed by the steam launch on board, through shallow water, to the shore, and that Darr and such real owners of the vessel and cargo had intent to do all this in fitting out the vessel, and putting her cargo on board, still a violation of the third section of the act of 1818 is not thereby made out. A vessel fitted out with intent to do this is not fitted out with intent to cruise or commit hostilities, within the sense of that section. * * * There is no satisfactory evidence that the vessel was furnished or fitted out or armed, or attempted to be furnished or fitted out or armed, with intent that she should be employed to cruise or commit hostilities in the sense of the third section of the act, in the service of the insurrectionary party in Cuba, against the government of Spain. There is no evidence that she was intended to do anything more than transport her cargo to the coast of Cuba, and cause it to be landed there on rafts, by the aid of the steam launch on board. To do this was no violation of the third section of the act, which is the one on which the libel is founded."

Having reached the conclusion that the evidence in this case is not sufficient to justify a decree of forfeiture against the Itata, it is unnecessary to discuss the effect of the subsequent recognition by the United States of the provisional government as the lawful government of Chile, and upon that question we express no opinion.

The judgment of the district court, in both cases, is affirmed.

HANFORD, District Judge, (concurring.) The importance of this case seems to me to furnish a sufficient excuse for the filing of individual opinions by the judges before whom it was argued in this court. I consider the seizure of the Itata upon the charges set forth in the libel of information in this case to have been justifiable. The circumstances connected with her coming to the port of San Diego, and clandestine departure therefrom, were not only sufficient to create suspicion, but gave the appearance of an unlawful purpose to be accomplished by use of said vessel, from which there might be resulting complications between our government and the republic of Chile. The duty of preventing insurgents and belligerents from using the seaports of this country as places for the fitting out of armed vessels to be employed in acts of hostility towards other countries, requires the national authorities to act with promptness and vigor whenever actions or movements of persons or vessels afford reasonable grounds for supposing that a violation of the neutrality laws of the United States is about to be attempted; and the authorities are justified in acting upon appearances. But, the case having been submitted to the test of judicial inquiry, the court is called upon to deal with realities, and not appearances, and to decide according to the facts as developed and shown by the evidence. Forfeiture of the vessel under section 5283, Rev. St. U. S., cannot be decreed unless the government has established by proof the existence of all the facts as to acts and intents essential to bring the case within the purview of the statute.

While the case is founded upon a municipal law, it requires consideration of international relations and comity. The purpose of the statute is to maintain peace between other countries and ours on terms of fairness and justice by prohibiting the prepara-

tion within this country of hostile expeditions against other nations. Section 5283, Rev. St., does not make the fitting out and arming of a vessel at a port of the United States unlawful unless it be coupled with specified intents or purposes, one of which is that the vessel, after being so fitted out and armed, "shall be employed * * * to cruise or commit hostilities against the subjects, citizens, or property of" a foreign prince, state, colony, district, or people. The libel of information in this case charges that certain persons did unlawfully fit out and arm the Itata with intent that she should be employed to cruise and commit hostilities against the republic of Chile. On this point there is an issue, and a finding of the truth of the charge is indispensable to a sufficient basis for a lawful decree in favor of the United States. It is a strange anomaly of the case that this issue is made by the republic of Chile. The acts whereby the vessel has become forfeited, as the libel of information alleges, if criminal at all, are so because designed to do harm to the government of Chile; and in the very suit in which it is sought to have the forfeiture adjudged for said cause that government has intervened, claiming a right of property in the vessel, and by its answer has assumed responsibility for the acts alleged to be criminal, and avows that all the persons who participated in said acts, instead of being enemies, are and were its faithful defenders. The bond given for the release of the vessel which is now held in place of the vessel was given in its behalf, so that the penalty in case of a decree in favor of the United States must fall upon an independent nation, and that nation the one for the sake of whose friendship our government has taken the pains to arrest the Itata and now prosecute this case.

It is said that the case should be determined according to the facts existing at the time of the occurrences, and that, if the Itata was then in the hands of insurgents, whose purpose was to employ her as a transport in making war upon the established government of Chile, acts of the insurgent forces in violation of a statute of the United States do not become purged of criminality by the subsequent success of the insurrectionary enterprise. It is unnecessary to admit or controvert the soundness of this proposition, because it does not fit the facts of the case. It is not applicable, for the reason that the Congressional party, instead of being an organization of rebels against the government of Chile, was in fact composed of and controlled by the legislative branch of the national government, and was supported by a considerable part of its military and naval forces. The object of the Congressional party was not revolution, but the preservation of the government by deposing President Balmaceda for maladministration of his office. Balmaceda was not the government. He was merely the highest officer and head of the government. The struggle, therefore, was not between the government and a faction, but between the different departments of the government. While it continued the condition of affairs in Chile was similar to what might have been brought about in the United States if a sufficient number

of senators had voted for the impeachment of President Andrew Johnson, and the vote had been followed by an attempt on his part to forcibly resist removal from office. The right to determine finally every question involved in that struggle, belonged to the people of Chile, and their decision must be accepted everywhere as conclusive. It is now an historical fact that the Congressional party, in whose service the Itata was employed, represented the will and sovereignity of the Chilean people. This court is bound, in deciding the case, to take notice of the important facts of history. We cannot be expected to attempt a retrial of the question of right or wrong in what the people in Chile have done for themselves.

By the foregoing considerations I have been led to the conclusion that the accusation against the Itata has not been sustained. The contrary is established, and I think that the decision of this court affirming the judgment of dismissal rendered by the district court ought to be placed upon the ground that the vessel was not intended for service against the republic of Chile.