---

## THE LUCY H.

### (District Court, N. D. Florida. May 16, 1916.)

1. NEUTRALITY LAWS ⬤—3—CONSTRUCTION OF STATUTE—ARMING VESSELS AGAINST FRIENDLY POWERS—"COLONY, DISTRICT OR PEOPLE."

By Cr. Code, § 11 (Act March 4, 1909, c. 321, 35 Stat. 1090 [Comp. St. 1913, § 10175]), which makes it a criminal offense to fit out and arm, within the jurisdiction of the United States, any vessel "with intent that such vessel shall be employed in the service of any foreign prince or state, or of any colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace," Congress designed to secure the neutrality of the United States, not only in wars between other nations recognized, and between contending parties recognized, as belligerents, but also by the words "colony, district or people," which were added by amendment in 1818 (Act April 20, 1818, c. 88, § 3, 3 Stat. 447), between warring factions contending for exclusive dominion, although there has been no political recognition of either as sovereign or of a state of belligerency.

[Ed. Note.—For other cases, see Neutrality Laws, Cent. Dig. §§ 3–8; Dec. Dig. ⬤—3.

For other definitions, see Words and Phrases, Colony.]

2. NEUTRALITY LAWS ⬤—3—CONSTRUCTION OF STATUTE—ARMING VESSELS AGAINST FRIENDLY POWERS—"PRINCE"—"STATE."

Within Act April 5, 1794, c. 50, § 3, 1 Stat. 383, prohibiting fitting out and arming of vessels "with intent to be employed in the service of any foreign prince or state to cruise or commit hostilities upon the subjects, citizens or property of another foreign prince or state, with whom the United States are at peace," the words "prince or state" meant a sovereign or a political community entitled to admission into the family of nations; and, as such, political recognition was essential, and the words did not include an insurrectionary body or an unrecognized force of belligerents contending for the sovereignty of any given territory.

[Ed. Note.—For other cases, see Neutrality Laws, Cent. Dig. §§ 3–8; Dec. Dig. ⬤—3.

For other definitions, see Words and Phrases, First and Second Series, State.]

3. WORDS AND PHRASES—"STATE"—"NATION."

A "state" or "nation" denotes a political community organized under a distinct government recognized and confirmed by its citizens and subjects as a supreme power.

[For other definitions, see Words and Phrases, First and Second Series, Nation; State.]

4. WORDS AND PHRASES—"PRINCE."

A "prince," in the general acceptation of the term, when applied in the law of nations, signifies a sovereign, a king, emperor or ruler; one to whom power is delegated or in whom it is vested.

In Admiralty. Libel of information and seizure maritime by the United States against the American schooner Lucy H. for violation of neutrality laws. On exceptions to libel. Overruled.

On September 14, 1915, the American schooner Lucy H. then in the port of Pensacola, Fla., in command of one H. B. Snell, master, took on board, besides a crew of 9 men and 15 Mexicans, a cargo of 162 rifles and 25,000 rounds of ammunition. Whereupon the vessel proceeded to Key West, Fla., arriving there about the last of the month. Here two more cases of rifles and a quantity of stores were added to the cargo. On the night of Tuesday, October 19, 1915, the vessel sailed from Key West in an unauthorized manner, and proceeded toward Tuxpam on the east coast of Mexico. The Mexicans taken on board at Pensacola remained with the vessel throughout the voyage. They were not shipped as crew nor listed as passengers. Near Tuxpam the Lucy H. discharged 2 of her crew, who went ashore with 2 of the Mexicans in one of the ship's boats and did not return. The schooner then beat up and down the Mexican coast two or three days, during which time, while off a settlement, another Mexican was sent ashore. Finally the Lucy H. dropped anchor, and the remainder of the Mexicans and all of the cargo were sent ashore, after which the schooner sailed for Pensacola, arriving on November 11, 1915, where she was seized upon a libel of information which charged substantially in alternative articles, under section 11 of the Penal Code, that: "The said schooner Lucy H., on the 14th day of September A. D. 1915, within the navigable waters of the United States and within the jurisdiction of this court, was then and there unlawfully furnished, fitted out and supplied * * * and armed with a military expedition of 15 armed men, more or less, with intent to be employed in the service of the Villaistas, certain insurgents in the country called Mexico, with whom the United States were and are at peace, with intent to cruise and commit hostilities against the subjects, citizens and property of * * * "—First, the people of Mexico; second, Gen. Carranza, a foreign prince; third, the colony of Mexico; fourth, the district of Mexico; fifth, the republic of Mexico; sixth, the de facto government and the forces of Gen. Carranza; with whom the United States then were and now are at peace, etc.

John L. Neeley, U. S. Atty., of Tallahassee, Fla., and Phillip D. Beall, Asst. U. S. Atty., of Pensacola, Fla., for libelant.

John P. Stokes and Scott M. Loftin, both of Pensacola, Fla., for respondent.

SHEPPARD, District Judge (after stating the facts as above). The American schooner Lucy H. was seized by the United States on a libel of information with 36 articles, charging a violation of the Neutrality Act as finally amended April 20, 1818 and embodied in section 11 of the Penal Code of 1910 (Comp. St. 1913, § 10175), the pertinent provisions of which read:

"Whoever, within the territory * * * of the United States fits out and arms * * * any vessel, with intent that such vessel shall be employed in the service of any foreign prince or state, or of any colony, dis-

trict, or people, to cruise or commit hostilities against the subjects, citizens, 'or property of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace * * * and every such vessel, * * * her tackle * * * materials * * * stores * * * shall be forfeited."

The sufficiency of the libel in law is challenged by several exceptions, the sixth and seventh of which test the substance of the case as made by the libel, and submits for judicial determination the concrete question whether the acts charged in the libel as delictum come within the inhibition of the statute. These exceptions maintain substantially that to violate the statute the vessel must be fitted out "with intent * * * [to] be employed in the service of any foreign prince or state, or of any colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace," and who are at the time enjoying independent political recognition.

First. It is contended that the whole import of the libel is that the vessel was to be employed in the service of named bandits, whom it is impossible to bring within the first prohibitive classes described in the Neutrality Act, viz., "any foreign prince or state, or of any colony, district or people."

Second. It is contended by the claimant that, according to the articles of the libel, the vessel was not fitted out to cruise against the "subjects, citizens or property of any foreign prince or state, or of any colony, district or people with whom the United States are at peace," but against another faction of brigands, not emulating the dignity of a "foreign prince or state, or * * * colony, district or people," or any designated class entitled to the protection extended by Congress to recognized foreign nations or governments "at peace" with the United States.

The exceptions therefore raise both the questions of political recognition of the foreign party or authority employing the expedition, as well as the intention of Congress in amending the statute by adding to the section as it originally read, in both branches, the words "or of any colony, district or people."

[1-4] For an intelligent comprehension of the effect of the amendment, a brief review of the pertinent cases construing the act before and since the amendment may be useful. Many of the cases cited, compared, and discussed by counsel in their exhaustive arguments (The Carondelet [D. C.] 37 Fed. 801; The Conserva [D. C.] 38 Fed. 431; The Florida, 4 Ben. 452, Fed. Cas. No. 4,887; The Itata, 56 Fed. 505, 5 C. C. A. 608) were cases adjudged before the comprehensive decision of The Three Friends, 166 U. S. 54, 17 Sup. Ct. 495, 41 L. Ed. 897, and are interesting more in that they emphasize the marked reluctance of courts to depart from established precedent than to illuminate the subject under discussion.

The inferior federal courts, having occasion to construe the law with the amendment, have followed with unrelenting tenacity Gelston v. Hoyt, 3 Wheat. 246, 4 L. Ed. 381, which, according to the history

of the particular legislation, rendered necessary the present enlarged provision of the act to meet situations wherein the previous or original act because of its restricted scope was deficient. Gelston v. Hoyt, supra, was an action of trespass against the collector and surveyor of the port of New York for seizing an American ship under orders of the President, dated July 10, 1810, for a violation of the act of 1794, § 3 (1 Stat. 383, c. 50), which provided for cases in which the vessel was fitted out and armed—

"with the intent to be employed 'in the service of any foreign prince or state, to cruise or commit hostilities upon the subjects, citizens or property of another foreign prince or state, with whom the United States are at peace.' "

The defendants in the case pleaded that the seizure was justified under the statute, and that they were not responsible for the spoliation of the cargo and the damages suffered by the ship. Construing this statute, the court said (page 323 of 3 Wheat., 4 L. Ed. 381, supra):

"But the other point which has been stated * * * involves the construction of the act of 1794 (chapter 50, § 3). * * * No evidence was offered to prove that either of these governments was recognized by the government of the United States, or of France, 'as a foreign prince or state'; and, if the court was bound to admit the evidence, as it stood, without this additional proof, it must have been upon the ground that it was bound to take judicial notice of the relations of the country with foreign states, and to decide affirmatively that Petion and Christophe were foreign princes within the purview of the statute. No doctrine is better established than that it belongs exclusively to governments to recognize new states, in the revolutions which occur in the world; and until such recognition, either by our own government or the government to which the new state belonged, courts of justice are bound to consider the ancient state of things as remaining unaltered."

Recognizing the effect of this decision, Congress in amending the act sought to extend its scope and include other broadly defined persons, groups, or classes in the service of whom hostile expeditions might be employed other than princes or states, as well as against whom hostilities might be committed.

The Supreme Court in the case of The Three Friends, supra, had under review sharply the point whether the act of fitting out an expedition "to be employed in the service of any foreign prince or state, or of any colony, district or people" was meant, as held by the lower court, to refer to a "body politic" which had been recognized by our government at least as "a belligerent."

The Supreme Court, in considering the application of the first branch of the section which designates in whose service the expedition was to be employed, broadly held that the word "people," taken in connection with the words "colony" and "district," covered any insurgent or insurrectionary body of people acting together, undertaking, and conducting hostilities, although its belligerency had not been recognized, and in reversing, the lower district court said:

"Of course a political community whose independence has been recognized is a 'state' under the act; and, if a body embarked in a revolutionary political movement, whose independence has not been recognized, but whose belligerency has been recognized, is also embraced by that term, then the words 'colony, district or people,' instead of being limited to a political community

which has been recognized as a belligerent, must necessarily be held applicable to a body of insurgents associated together in a common political enterprise and carrying on hostilities against the parent country, in the effort to achieve independence, although recognition of belligerency has not been accorded."

The remaining question for decision is whether or not Congress, by the addition of the phrase "or of any colony, district or people" to the words "any foreign prince or state" in the second branch of the section, sought to provide protection for an unrecognized foreign faction laying claims to sovereignty. By reference to standard dictionaries, as well as authorities on international law, it will be found very well settled that a "state or nation" denotes a political community organized under a distinct government recognized and conformed to by its citizens and subjects as the supreme power. A "prince," in the general acceptation of the term according to authorities when applied in the law of nations, signifies a sovereign, a king, emperor, or ruler; one to whom power is delegated or vested. Necessarily, when the statute of 1794 described the contending factions, parties, or belligerents as "any foreign prince or state * * * against * * * another foreign prince or state," it described a sovereign or a political community entitled to admission into the family of nations; and, as such, political recognition was essential to the operation of the statute as it read. It did not then describe or cover in either branch of the section an insurrectionary body or an unrecognized force of belligerents contending for the sovereignty of any given territory. By the adjudged cases, chiefly Gelston v. Hoyt, supra, this defect in the act was disclosed to Congress and culminated in the re-enactment of April 20, 1818, now under consideration. In The Three Friends, supra, page 56 of 166 U. S., page 499 of 17 Sup. Ct. [41 L. Ed. 897], alluding to the amendments in the first branch of the section, the court say:

"At all events, Congress imposed no limitations on the words 'colony, district or people,' by requiring political recognition."

Further on in its opinion the court referred to the case of The Salvador, L. R. 3 P. C. 218, and regarded the observations therein as "entirely apposite," and, as before noted, held that the amendment covered any "insurgent or insurrectionary body of people * * * undertaking and conducting hostilities." In passing, the court called attention to the use of the same words, "colony, district or people," in the succeeding part of the section, and stated that as thus used they were employed in another connection, and "were affected by obviously different considerations." While this was a direct reference to the "succeeding part of the section," in the light of the opinion it cannot be held to possess the dignity of a construction, for the question as to its scope was not before the court, not necessary to the decision, and hence could not have been authoritatively decided there. In the view of this court such statement is in no wise controlling in the case at bar, for it clearly falls within the rule laid down by Chief Justice Marshall in the case of Brooks v. Marbury, 24 U. S. (11 Wheat.) 78, 6 L. Ed. 423, viz.:

"General expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the

case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." Cited among other cases is Schaap v. United States, 210 Fed. 856, 127 C. C. A. 415, text.

It may be true that for a political community to be entitled to political recognition under the law of nations, it should have the attributes of sovereignty. In that event the provisions of the statute "any foreign prince or state" would necessarily embrace such a community. If recognition followed, that recognition would take place in the orderly way prescribed by rules governing such matters in national intercourse. There would be the necessary representative, the formal demand, and the formal action of the political department of the recognizing power.

Interpreting one section of the Neutrality Act after the amendments of 1818, the Supreme Court, in the case of Wiborg v. United States, 163 U. S. 647, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289, text, observed:

"It [the Neutrality Act] was undoubtedly designed in general to secure neutrality in wars between two other nations, or between contending parties recognized as belligerents, but its operation is not necessarily dependent on the existence of such state of belligerency."

Congress undertook to preserve the neutrality of the United States, not only in wars between states and nations recognized, but also in insurrections and political revolts in foreign countries where such contests produce a situation in which both factions are striving for exclusive dominion. If the United States is to preserve neutrality toward other nations and peoples as Congress designed, its ports cannot be used as a base of operations for military expeditions or enterprises which may not only go in furtherance of or in assisting an insurrectionary force, but which in its very nature, in the absence of strife, might incite revolt. Manifestly, therefore, Congress, in the addition of the words "colony, district or people," to the second branch of this section sought to provide for a situation which, and to describe a body of persons whom, it was impracticable to recognize politically.

There is no apparent reason for restricting the interpretation of the amendment to the first branch of the section, as stated in The Three Friends, supra, and there certainly is nothing in the opinion to warrant the view that the words "foreign prince or state, or of any colony, district or people," as used in the second branch of the section, against whose "subjects, citizens or property" hostilities were intended, should receive a more strict application. Indeed, such a construction would fail utterly to compass what President Madison moved Congress to do by his earnest appeal for "more efficient laws to prevent violations of the neutrality of the United States as a nation at peace," by permitting belligerent parties to arm and equip vessels within the waters of the United States for military purposes.

From what is said it follows that the construction placed on the first branch of the particular section of the Neutrality Act is equally applicable to the second branch of the section, and consequently political recognition of the objects of the hostilities is not required as a condition precedent to a violation of the act, and the exceptions numbered 6 and 7 will be overruled.