UNITED STATES *v.* TWO HUNDRED AND FOURTEEN BOXES OF ARMS, AMMUNITION, AND MUNITIONS OF WAR.

UNITED STATES *v.* ONE HUNDRED AND FORTY KEGS OF GUNPOWDER.

*(District Court, E. D. Virginia.　February 4, 1884.)*

NEUTRALITY LAWS—VIOLATION OF—HOSTILE EXPEDITION—SEIZURE—FORFEITURE OF MUNITIONS—EVIDENCE—REV. ST. § 5283.

　　The steam-tug Morgan was purchased and repaired at New York, to be sent to the waters of Hayti and used there to commit hostilities in aid of the late insurrectionists against the government of Hayti, with which the United States are at peace.　Shortly before she was to sail, two cannons, with naval carriages, sundry boxes of Winchester rifles and Springfield muskets, with ammunition, and 100 kegs of gunpowder, were purchased by the purchasers of the Morgan and put on board a schooner at New York, which had cargo for Richmond, with orders, on being hailed by concerted signals, to put these munitions off somewhere near the Virginia capes, on any steamer giving the concerted signals.　The proofs showed that the Morgan was to be the steamer to take these munitions off the schooner.　The Morgan, when about to set out from New York, was seized by the United States marshal on the charge of attempting to violate the neutrality laws of the United States, and failed to be at the Virginia capes to receive the said munitions.　The schooner, accordingly, proceeded on her voyage to Richmond, and on her arrival there the munitions were seized under a libel in admiralty for forfeiture, under section 5283, Rev. St.　*Held*, on the proofs, that the munitions were liable to forfeiture.

　　This case is a sequel to that of the *Mary N. Hogan*, 18 FED. REP. 529

In Admiralty.

*Edmund Waddill*, U. S. Atty., and *Geo. J. Schermerhorn*, for the United States.

*A. M. Keiley* and *J. E. Sudden*, for claimant.

HUGHES, J.　These are libels of information brought by the United States attorney, for and in behalf of the United States, against two cannons, sundry cases of fire-arms and ammunition, and kegs of gunpowder, found on board the schooner E. G. Irwin, lying in the port of Richmond, and seized for forfeiture in August last.　The two proceedings are founded upon section 5283 of the Revised Statutes of the United

States, which, so far as applicable to this case, provides that every person who, within the limits of the United States, attempts to fit out and arm, or is knowingly concerned in the furnishing, fitting out, and arming, of any vessel, with intent that such vessel shall be employed in the service of any foreign people to cruise or commit hostilities against the citizens of any foreign state with which the United States are at peace, shall be punished as provided by law; and that all the materials, arms, and ammunition which may have been procured for the equipment of such a vessel shall be forfeited.

The case of the prosecution is claimed to be that the steam-tug Mary N. Hogan, lying in the port of New York in July last, was made ready to be sent out to the waters of Hayti to cruise and commit hostilities in those waters, as a gun-boat, in behalf of the insurrectionists of that island, against the republic of Hayti; and that the two cannons, the cases of fire-arms and ammunition, and the kegs of gunpowder, which were seized on board of the Irwin under process of this court, were intended to be put upon her as her armament and outfit, and to have been taken on board of the Hogan from the Irwin at some point on the Atlantic seaboard near Hog island or Hampton roads; and that they were shipped at New York on the Irwin for that purpose; and that Capt. Dodd, the master of the Irwin, knew of such character and destination of this part of his cargo, and therein willingly and knowingly assisted in the attempt to arm, fit out, and furnish the Hogan, although it is conceded that he was ignorant of the particular steamer which he was thus to aid in furnishing, and of her name. The prosecution have produced evidence tending to prove, among others, the following facts, namely:

On the fifteenth of March, 1883, an expedition left Philadelphia on the steamer Tropic, with arms and ammunition, nominally bound for Kingston, Jamaica. The steamer, instead of going to Kingston, went to the island of Inagua, lying between Hayti and Jamaica. There she took on board Gen. Bazelais, with some 75 armed men, and afterwards took on about the same number of men from an English steamer at sea. She then proceeded to the port of Marigoane, Hayti, with all men, arms, and ammunition, and landed them about daybreak, when, under the command of Gen. Bazelais, they successfully inaugurated the rebellion against the government of Hayti, which continued to maintain itself through the year 1883. This Gen. Bazelais had, before leaving Jamaica, supplied one Simon Soutar, a merchant of Kingston, with money for purchasing arms and ammunition. Those which went out on the Tropic were purchased in New York by one Henry A. Kearney, on Soutar's order, from Joseph W. Frazer, a dealer in such goods, and were shipped by Frazer to Philadelphia, and shipped by Kearney at Philadelphia on the Tropic. The master and mate of the Tropic were afterwards tried in Philadelphia, and convicted and sent to the penitentiary for the violation of section 5286 of the Revised Statutes of the United States, of which they were found guilty. See *U. S.* v. *Rand,* 17 Fed. Rep. 142. Early in the summer of 1883 Soutar appeared in New York, and was in conference with Kearney, Frazer, one George W. Brown, and one Wellesley Bourke. Kearney had been vice consul of the United States, during some years before 1883, in Hayti. Afterwards he had been consul of Hayti in New York. Brown had conducted business in Jamaica, and knew Soutar, and had known Kearney for

10 years. Brown's business in New York in July last was that of an insurance agent, but he took part in the affair about to be mentioned as an outside job. Bourke was the agent of the Haytian insurrectionists in New York. A sequel of the intercourse of these men was that a steam-tug called the Mary N. Hogan, capable of carrying some 75 tons or more in weight of freight, not in large bulk, was purchased, with money supplied by Soutar, through the agency of Kearney, at a cost, all told, of $11,600. There were also purchased by Kearney, with funds supplied by Soutar, the guns, arms, and ammunition which are the subjects of the present libels, at a cost of $7,000. They were bought of Joseph W. Frazer, the same person who had sold the like articles which had gone to Marigoane on board the Tropic. Kearney, wishing to keep in the background, got Brown to engage a vessel by which these military goods might be sent out of New York billed for some home port; and Brown, through a regular ship-broker in New York, engaged the schooner E. G. Irwin—Silas H. Dodd, master—for that purpose. It was concerted between Kearney, Brown, and Dodd that after these military goods were put on board the Irwin, and after the schooner should have proceeded down the coast for some distance, say to Hog island or Hampton roads, she should be hailed, by means of concerted signals, by a steamer bound from New York for Hayti, and that the munitions of war on board of her should be transferred to the steamer. Dodd, however, was not informed what steamer was to relieve him of his military cargo, or of its name.

The Hogan, before being purchased by Kearney for Soutar, was examined by Edward A. Bushnell, a friend of Kearney, who had sometime before been chief engineer of the Haytian navy. John H. McCarthy, an adventurous and somewhat dissipated character, was employed as master, and the bill of sale of the Hogan, when purchased, was made in the name of McCarthy as owner; but he executed a mortgage for the amount of the purchase money, on the vessel, in favor of a Mr. Abbott, a merchant of Jamaica, and friend of Soutar. Patrick Cox was employed as chief engineer, and Finton Costigan as gunner. Several weeks were consumed in making repairs and preparations, and on the twentieth of July the Hogan, with a crew and a supply of coal, but without other freight, was ready to leave for her destination, when she was seized and libeled by the United States for an attempted violation of the neutrality laws, under section 5283 of the Revised Statutes. Prevented in this way, as the Hogan was, from proceeding on her intended voyage, there was no steamer to overhaul the schooner Irwin in her sail down the coast, and to relieve her of the arms and military munitions which constituted part of her cargo. She had taken on pig-iron and cement at New York for Richmond at the time when she had been engaged to take the military munitions; and these latter had been consigned, as a matter of form, to "order" in Richmond. The Irwin, therefore, looked out in vain for a steamer during her voyage down the coast; and after standing off Hog island for a couple of days, and lying at anchor in Hampton roads for a week, she came, with all her cargo, on to Richmond. Here she discharged her legitimate cargo, but was herself arrested and libeled by the government at the same time that the contraband portion of her cargo was seized.

In opposition to this train of testimony the defense deny that the Hogan was intended for warlike cruising in the waters of Hayti against that republic; insist that she was purchased for the purpose of being sent out and used in the port of Antonio, Jamaica, to raise a steamer, the Calvert, which had been sunk in the harbor there in a collision, and which had been purchased at auction, as she lay, by Soutar; and, not controverting many of the facts brought out in evidence by the prose-

cution, yet insist that the purchase of the arms and munitions seized on the Irwin was for the purpose of their being shipped, as a commercial venture, to Jamaica, on board the Hogan. The case is the same in its principles, and substantially the same in its evidence, with that of *The Mary N. Hogan,* which was tried in the district court of the Southern district of New York in November last, and in which there was a decree of condemnation and sale against the Hogan. The case is reported in 18 Fed. Rep. 529. The evidence was so fully discussed in the opinion of Judge Brown, delivered in that case, that I am relieved of the necessity of a minute detail of so much of it as goes to show the purpose and destination for which the steam-tug Hogan was intended. I probably have a right to regard that part of the case before me as *res judicata;* but feeling disposed, in the cases at bar, to consider the question of the character and destination of the Hogan as an original one, I have gone anxiously and thoroughly over all the voluminous evidence before me on that subject, and find myself constrained to adopt precisely the conclusions that were reached by Judge Brown, and are set forth in his opinion in that case.

Counsel for defense insist that there is no direct proof of an illegal purpose in fitting out the Hogan. That would be an insufficient objection if the circumstances were such as to leave no other reasonable hypothesis than that of her guilt, and if they pointed conclusively to that fact. But there is very much direct evidence. The chief engineer, Patrick Cox, and the gunner, Finton Costigan, of the Hogan, testify positively and circumstantially that McCarthy, the master of the Hogan, told them that they were to fight the vessel against the Haytian government; that she was going there for that purpose; that a bounty of $5,000 would be divided, on reaching there, between her four principal officers; and that they hired themselves for that express enterprise. Declarations of McCarthy to the same effect, made to others when off his guard from liquor, were also proved. The pretense that the Hogan was to be used in the port of Antonio to raise the Calvert is insufficient to overcome the circumstantial and positive evidence sustaining the hypothesis of the prosecution, that she was intended to be used as a gun-boat in the waters of Hayti. The Calvert cost, as she lay, $500 or £500,—the evidence seeming to be confused as to the two sums,—but I suppose the true price was £500. In order to save this £500, it is pretended that Soutar went nearly a thousand miles to New York, and paid $11,600 for a tug-boat to be used for the purpose of raising the Calvert; putting on that tug-boat when about to sail no sort of apparatus such as salvors employ in lifting ships from the bottom of the sea. If the raising of the Calvert had been Soutar's real object, the services of experienced wreckers, provided with wrecking schooners, and wrecking pumps, anchors, cables, falls, and other expensive material such as are kept on hand only by professional wreckers, would have been sought in Havana,

Savannah, Charleston, Norfolk, or New York, and employed, on a contingent compensation, to effect the raising. It will not do in an admiralty court, accustomed to the trial of wrecking and salvage cases, to insist that a sensible man would content himself with purchasing a single steam-tug (an instrument of most subordinate utility in such an enterprise) in the expectation of raising with it an ocean steamship from the bottom of a harbor. Sunken vessels are not raised by steam-tugs. All the apparatus of professional wreckers is required for the purpose. A court will generally make charitable presumptions in favor of accused persons, where there is a question of forfeiture, but I find myself unable to accept the presumption that a steamtug was bought in New York at a cost of $12,000 for the purpose of raising a steam-ship from the bottom of the harbor of Antonio, Jamaica, which cost only £500, and was to be sent out for that purpose without a particle of wrecking apparatus on board, except some sort of windlass, but loaded down with military guns and ammunition. The Hogan bore less than two feet of free-board. A cargo of 20 or 30 tons, which was the weight of these munitions, would have put down her deck to within 12 inches of the water. Even on a smooth July sea, a voyage to the West Indies would have been a desperate commercial venture, and yet we hear nothing of insurance either upon vessel or cargo. Commercially, the enterprise would have been reckless. As a military venture, it was no more desperate than military raids usually are, especially upon the high seas. In short, it is impossible to read the evidence in these cases, in a judicial spirit, without being impressed with the irresistible conviction that the Hogan was bought and prepared in New York for the purpose of being sent directly to Hayti, with cannons, gun-carriages, small-arms, ammunition, and powder, which were to be taken on board at some point on the coast from some other vessel, and with this armament was intended to be used as a gun-boat in the waters of Hayti, in aid of the insurrectionists of that island, against that republic. Technically, this question comes to me as *res adjudicata* under the decree of the district court of the Southern district of New York, rendered on the twenty-third of November, 1883. Actually, it is proved to me by evidence which leaves room for no other conclusion.

I come, therefore, to the additional questions on which the cases at bar depend, namely: *First,* whether or not the military material which is the subject of these libels was intended to be sent out as merchandise, in a commercial venture, and destined to some point in the West Indies for sale as merchandise. If not, whether this military material was intended to be sent directly to Hayti, as the military outfit of the gun-boat Hogan, for use in the hostile and insurrectionary enterprise for which that vessel was destined. No principle of the law is more clear or well settled than that merchandise, including munitions of war, may be sold to belligerents without violating the laws of neutrality. If those munitions had been sent on a vessel of commerce, which

itself was not to engage in hostile operations, for the purpose of being landed and sold in a neutral port, even to a belligerent, they could not be confiscated. The general test of contraband as to neutrals is whether the contraband goods are intended for sale in a neutral market, or whether the direct and intended object is to supply the enemy with them. If the latter is the immediate object, and the property is destined to go directly to the belligerent for his immediate use, the case is within the inhibitions of the neutrality Code, and the other belligerent may confiscate. In the cases at bar the question is in different form, while the principle is identical. It concerns the furnishing, fitting out, and arming, in a neutral jurisdiction, of a vessel about to proceed directly to the theater of hostilities, and to engage in military operations. The Hogan, as already concluded, was intended for such a purpose, and on receiving these arms was intended to be directly bound to the waters of Hayti. These military goods were not to be taken to a neutral port to be sold in open market; they were not for sale at all. They were intended to be used on that steam-tug in flagrant hostilities. When they left Frazer's warehouse they ceased to be articles of commerce. They were no longer for sale. They were to be put in a covert and deceptive manner upon a vessel at sea, and to constitute her outfit for engaging in hostilities against a state with which the United States are at peace. It is useless to cite legal authorities on this subject. The law is in the form of an express statute. Its principles are plain and elementary, and need only to be stated to be comprehended and approved. It is not denied by the defense that these munitions were intended to be put upon the Hogan when she should have got fairly out at sea. Admitting that fact, they deny that the Hogan was destined to Marigoane, and insist that she was going on a wrecking-expedition to raise a steam-ship from the bottom of the harbor of Antonio. That pretense was rejected by the court in New York, and is as emphatically rejected by this court. The Hogan was to go directly to engage in hostilities in the waters of Hayti; and these munitions were to be put upon her as her military furniture and outfit.

The only remaining question, therefore, is, did those who purchased the goods and shipped them on the Irwin, and did the Irwin's master, Capt. Dodd, know of this destination of the goods? Did they attempt to fit out the Hogan with these goods? Were they "knowingly concerned in furnishing, fitting out, and arming" the Hogan, or attempting to do so, with these goods? "Attempt to fit out and arm," "knowingly concerned in the furnishing, fitting out, and arming of any vessel with intent that such vessel shall be employed to cruise or commit hostilities against a state," etc., are the searching and comprehensive terms of the law applying to these libels. It were a waste of words, in view of the cumulative evidence in these cases, to state the proofs of the complicity of Soutar and Kearney in the purchase and preparation of the Hogan for her expedition; and of Soutar,

Kearney, and Brown in the purchase, shipment on the Irwin, and intended shipment on the Hogan at sea, of the munitions mentioned in these libels. I shall perform no such act of supererogation. They made the "attempt;" they were "knowingly concerned" in it. The only question is as to Capt. Dodd's complicity; though that is not an essential part of the case. These munitions were sent from Frazer's warehouse in New York to the Irwin, which had come up to an East-river wharf for the purpose of receiving them. Most of them were put on at that wharf; but the schooner fearing to lie long at that point, because of the powder on board of her, went off without receiving the remainder of the goods, and set sail down the coast. On going into the Delaware breakwater to Lewes, where the captain took on his family, the munitions which had been left were found to have been forwarded there by express, and were there taken on. There were two cannons. Some of the cases contained cannon-balls; others, ball cartridges; and others, fire-arms. Their weight became the subject of instant remark by the crew, who at once divined that, though shipped as "hardware," they were really arms, ammunition, and missiles of war. Capt. Dodd could not have been ignorant of their nature. The Irwin sailed on the 18th, and on that afternoon Capt. Dodd informed his able seaman, Thomas Smith, that these munitions were to go to Hayti, to be used there by the rebels against their government. He also gave the same information to his mate, Moses Monks, and directed him and Smith to be on the lookout for a steamer which was to come along bound to Hayti, and to take these munitions off the schooner. These men testified as to the red and white flag with which Brown had provided Dodd, and that it was kept flying at the flag-staff. Dodd told them that the expected steamer would recognize them by this flag, and was to hail them by dipping her own flag three times. These men testify to their own knowledge of the hostile destination of these munitions for the Haytian rebels, and that they derived it from Capt. Dodd, and that the steamer which was to hail them was to take these munitions directly to the waters of Hayti. This evidence is direct, positive, emphatic. It is not a matter of mere inference that Capt. Dodd was knowingly concerned in an attempt to furnish, arm, and fit out a steamer, which was expected to come along-side of him and take these munitions on board as her armament for committing hostilities against the government of Hayti. That Capt. Dodd did not know what particular steamer this was to be is immaterial. If a black steamer, sailing under a black flag, without name or home port, had come-along side of him at night, and, on complying with concerted signals, had taken these munitions on board and sailed off, without his being able to learn her name or identity, and she was proved to be destined, with Capt. Dodd's knowledge, on such an expedition as that for which the Hogan was intended, Capt. Dodd's guilty participation in this enterprise would have been no greater than it was in respect to the steamer Hogan, which was

equally unknown to him. If the claimant, Soutar, and his agent, Kearney, were engaged in the attempt, by shipping them down the coast on the Irwin, to put these munitions on the Hogan to be used on her in committing hostilities in Hayti, I do not know that it is necessary to establish a guilty knowledge of their scheme in Capt. Dodd. He might be innocent, though the goods were guilty; but, whether necessary to the condemnation of the goods or not, I hold that the guilty knowledge and participation in the plot is clearly established against Capt. Dodd by the evidence. It is useless for me to reiterate what has so often been ruled in principle, that the placing of these goods directly on the Hogan, by those knowingly concerned in fitting out that vessel, was not necessary to justify the condemnation of the goods. If they had passed through the hands of many draymen, and other intermediaries, and over many decks, before reaching the vessel whose outfit and armament they were intended to be, that ultimate destination made them guilty goods, and subjected them to condemnation.

I will sign a decree of condemnation and sale in both of these cases.