## UNITED STATES v. HART et al.

(Circuit Court, S. D. New York. April 9, 1896.)

NEUTRALITY LAWS—MILITARY EXPEDITION—SECTION 5286, REV. ST.—AID TO CUBAN INSURGENTS.

Upon an indictment charging defendants with beginning or setting on foot or providing means for a military expedition or enterprise from this country against Spain in aid of Cuban insurgents by the steamer Bermuda, where the steamer was arrested before she sailed, after taking on board about 60 men neither armed, equipped nor officered, and no proof except the doubtful testimony of one witness belonging to the party of any other intent on the part of the men except to go to Cuba and join the army after arrival there, the jury were instructed: (1) That it is no offense for individuals, singly, or in company, and in any way they choose, to go abroad for the mere purpose of enlisting in a foreign army, provided they do not enlist in, or set on foot here, or prepare, any military expedition or enterprise; (2) that such an expedition or enterprise, to come within the statute as one "carried on from this country," must consist of some body of persons designing to act together in a military way, and possess at the start from this country some element of a military character beyond the mere intent to enlist individually after arrival in Cuba; (3) that it is not necessary that it should possess all the elements of a military body at the start, but it is sufficient if there was a combination of men for that purpose, with the intent that it should become so before reaching the scene of action; (4) that it is not unlawful to transport peaceably and by an unarmed vessel a body of men as individuals to Cuba who wish to enlist there, and such transportation does not constitute a providing of the means for a military expedition or enterprise, unless there is some enlistment or combination or agreement of the men to act in some way as a military body, or the use of some military force is contemplated, if necessary, in order to reach the insurgent army.

On March 10, 1896, John D. Hart, Calixto Garcia, Samuel Hughes, Benjamin Guerra, Bernardo J. Bueno, Lawrence Brabazon and Joseph Miccheleno were indicted upon five counts, charging in substance a violation of the neutrality laws in beginning, setting on foot, or preparing for a military expedition or enterprise from this port against Spain, in aid of the Cuban insurgents, in violation of section 5286 of the Revised Statutes. They pleaded not guilty. Garcia did not appear pursuant to his recognizance, which was thereupon declared forfeited. The defendants Hart, Hughes, Guerra and

Bueno were brought to trial before a court and jury on April 5th to April 10th.    No witnesses were called by the defense.

The evidence for the government showed that at about 10 p. m. of February 24, 1896, a tug put about 60 men on board the steamer Bermuda, then lying at anchor a little below Liberty Island; that the steamer was thereupon taken in charge by United States officers on board the revenue cutter Hudson, which had been watching her; that an hour or two afterwards another tug came alongside the Bermuda and put the defendant Hart on board; that the defendant Garcia was upon the same tug and was arrested; that at about 2 a. m. the tug again returned near to the Bermuda, and seeing the cutter, steamed away, but was afterwards captured, with about 40 additional men; that these men with the others who went on board the Bermuda were mostly young men, apparently Cubans; that they were without arms or other military equipments, except that a few had revolvers and that no arms were on board the Bermuda; that at about 3 a. m. the revenue cutter found and seized the tug Stranahan further down the bay, loaded with military arms and equipments, consisting of about 900 rifles, besides revolvers, machetes, boots and shoes, hammocks, blankets and medical supplies, all of which had been taken on board the Stranahan at the Atlantic Basin between 8 and 10 o'clock the evening previous; that the defendant Hughes was in charge of this cargo; and that a chest with clothing bearing his name or initials was found upon the Bermuda.    The defendants Guerra and Brabazon were on board the Bermuda and stated that the steamer was bound for Cuba with men for the insurgent army some of whom were not on board, and that a tug with ammunition was down the bay.    The witness Del Villar testified that he visited Garcia twice at an office on Broadway about the 10th or 12th of January, 1896, where he was addressed as "General," and on the last occasion was accepted by Garcia to go to Cuba and join the insurgent army; and that he signed a paper containing other names.    On the first day that he testified he stated that he did not read or know the heading of the paper he signed, that it was not read to him, that no other person signed it in his presence, and that he did not have there any conversation with other men about it or about going to Cuba.    The following day he testified that he saw the heading of the paper, which was in writing a few inches long, that he did not read the whole heading but saw at the top the words: "Soldiers Incorporated in the City of New York for the Independence of Cuba."

He further testified that after this he went on board the steamer Hawkins on the 26th of January, with numerous other men; that the Hawkins soon after leaving New York foundered, the men being rescued, and at length returning to New York; that he recognized a number of the same men on the Bermuda that were on the Hawkins; that during the interval before boarding the Hawkins on the 24th of February, he had received $5 per week three times from a person named Almazor, who had conducted him and several others to the Hawkins, and who had directed him to the tug that put him and others in his charge on board the Bermuda.

The evidence further showed that the Bermuda had been purchased

ostensibly for the fruit trade not long before, by the defendant Hart in the name of a British subject resident here; that Hart paid a portion of the price, and the defendant Guerra, the balance; that Hart had also engaged some of the officers of the Bermuda, including Brabazon, the registered master, who was intended to act afterwards as mate; that the Bermuda was cleared at the custom house in the afternoon of February 24th upon the oath of Brabazon, the ostensible master, that she was going to Santa Martha.

Jason Hinman and Max J. Kohler, Asst. U. S. Attys.
William M. Ivins, for defendants Hart, Hughes, and Brabazon.
Emmet R. Olcott, for defendant Bueno.
Horatio S. Rubens, for defendant Guerra.

BROWN, District Judge. Gentlemen of the Jury: The object of the neutrality laws is mainly to prevent complications between this government and foreign powers. They were designed to prevent such complications by making criminal such acts as tend to embroil us with other nations; and in part, also, to assert, as history shows, our own sovereignty over military enlistments attempted to be procured on our own soil. Within five years after the adoption of the constitution, so long ago as 1794, these enactments were found necessary; and the law then passed is substantially the same as it exists to-day. In 1818 it was revised by a few changes of words here and there, not affecting the section under which this indictment has been framed. In the Revised Statutes of the United States adopted in 1874, the same provisions were incorporated and are now referred to by sections under the latter act.

Section 5282 deals with individual enlistments. Section 5286 deals with military expeditions. Section 5283 deals with armed cruisers, designed to commit hostilities in favor of one foreign power as against another foreign power with which we are at peace. Section 5282 prohibits any person from enlisting in this country as a soldier in the service of any foreign power. It also prohibits any person from hiring or retaining any other person to enlist, or to go abroad for the purpose of enlisting. But it does not prohibit any person, whether citizen or not, from going abroad for the purpose of enlisting in a foreign army. By our very legislation on this subject therefore, as apparent from this statute, our law permits individuals to go to foreign countries to enlist. I consider that important in this case, in its bearing upon the construction of section 5286, which was a part of the same original act. I say the law as thus framed cannot be construed otherwise than as designedly leaving the field open for all persons within our jurisdiction, whether citizens or not, to go to foreign states to enlist in their armies, if they choose to do so. As this is lawful for one man, so it is lawful for ten men or for twenty or a hundred men. It is a necessary incident to this lawful right, that men may go abroad for this purpose in any way they see fit; either as passengers by a regular line steamer, or by chartering a steamer, or in any other manner they choose, either separately or associated; so long as they do not go as a military

expedition, nor set on foot a military enterprise, which section 5286 prohibits.

We have, therefore, to consider these two sections together. It is a military expedition alone that is prohibited by section 5286. The language of the act is that "every person who within the jurisdiction of the United States begins, or sets on foot, or provides or prepares the means for, any military expedition or enterprise to be carried on from thence," that is, from this country, "against any foreign prince," and so on, shall be guilty of a high misdemeanor. While, therefore, the right of individuals to go abroad for the purpose of enlistment is undoubted, they must not go as a military expedition; they must not form, nor begin, nor set on foot, any military expedition to be carried on from this country, nor furnish or prepare means therefor.

These five defendants are indicted under section 5286; and they are now on trial before you on the contention of the government that they have either set on foot such a military expedition by forming a part of it, or that they have provided or prepared the means for it. Here the question then is,—and it is the principal question you have to decide: Was this enterprise, in which some 60 men are shown to have embarked on the Bermuda, besides about 40 others who, it is alleged, were designing to embark,—was this enterprise designed merely for the transportation of these men peaceably to Cuba, as individuals who wished and intended to enlist in the insurgent army on arrival there, and who, it may be, had promised to do so, but without any military organization here, or any intended military organization before enlistment in Cuba, and without any intended employment of military force in reaching the Cuban army; or, on the other hand, was the embarkation of these men on the Bermuda the beginning of a military expedition to be carried on from this country against Spain?

What then, is a military expedition, as distinguished from a nonmilitary transportation of persons for enlistment abroad? The term "expedition" signifies a journey or voyage by a body of men for some definite purpose. There are various kinds of expeditions. We have had expeditions of exploration, like Wilkes' expedition, Fremont's expedition, Greely's expedition and Peary's expedition; and so there have been many military expeditions. We speak of Xerxes' expedition into Greece. A military expedition, therefore, is an undertaking by a body of men of a military character. There must be a body, because one or two men cannot constitute an expedition. To fall within the statute, it must be a military expedition "carried on from this country." A mere lawful intent to enlist abroad cannot give a voyage a military character. The expedition must be military in character, as is admitted; and I cannot conceive how an expedition can be characterized as military, or be deemed to be "carried on" as a military expedition "from this country" within the language of the statute unless it have some at least of the essential elements of a military body when it starts.

The essential elements of a military body are, first, soldiers, as 's indicated by the very word "military," derived from miles, **a**

soldier. The fundamental idea of a military enterprise or expedition to be "carried on" from this country is that it is undertaken by soldiers or in some military service. Next is the relation of the soldier to the commander. It imports officers, and the duty of military obedience. Next arms; such arms as are appropriate to the enterprise; such as will enable the body to do the military work contemplated. Next, that it shall act as a unit in a military way, i. e., as a body bound together by organization under a definite command. And, finally, a military purpose, a purpose of attack or defense, a hostile purpose.

Now, here was an enterprise of some kind to transport men by the Bermuda,—to take them somewhere. A part went on board. Others, there is strong evidence to show, intended to go on board, but did not, because they were intercepted before they had embarked.

For the present, I will assume that you find that the destination of all these men was the Cuban insurgent army. But if you find that they were designed to be taken there, or that they wished to go there, do you find in this undertaking beyond reasonable doubt any of the essential elements of a military expedition? I do not say that in order to constitute a military expedition to be "carried on from this country" as the statute reads, it must be complete at the start, or possess all the elements of a military body. It is sufficient if there was a combination by the men for that purpose, with the agreement and the intention of the body that embarks that it should become a military body before reaching the scene of action. Such a combination and agreement, if means for effecting it were provided, followed by embarkation in pursuance of the agreement, would show such a partial execution of the design on our soil, as to bring the case within our statute, as "a military enterprise begun and carried on from the United States."

If, however, the expedition or enterprise was, designed only to transport munitions of war as merchandise to Cuba, though for the use of the insurgent army, and at the same time to transport a body of men as individuals to Cuba, who wished to enlist there, and that was all, then it was not a military expedition or enterprise under this statute; it would not be so unless the men had first combined or agreed to act together as a military force, or contemplated the exercise of military force in order to reach the insurgent army. In that case, I should regard it as a military expedition, for the reason that they had prepared for and intended to exercise military force in getting to the insurgent army, or landing in Cuba.

The question then for you upon the facts is whether there is sufficient evidence in what has been produced before you, mostly circumstantial, to show beyond reasonable doubt that there did exist the design of making this body of men who were leaving upon the Bermuda, a military force, or whether they contemplated, as a body, any military action; or whether they had already enlisted here in the Cuban army. If they had done the latter, if they had enrolled themselves as members of the Cuban army, and had thus become members of that body, agreeing already to act together as

such, and the transportation of these men was under such an enrollment and agreement, I think that would be setting on foot a military expedition here.

Almost all the evidence in the case is indirect. But you must remember that it is natural that this should be so. Inasmuch as it is legal and lawful for men and munitions of war to be transported to the scene of belligerent operations, those who are engaged in it run the risk of capture, of being sunk in the operation; and there is a necessity on their part, while doing an act which is lawful so far as this country is concerned,—there is a necessity, I say, that they should protect themselves by every reasonable means against surprise. There is nothing, therefore, out of character in such an expedition, though it be a lawful one here, that it should be secret, or that there should be an air of mystery about it, or that it should be conducted as secretly as possible. It would be the same if it were unlawful. Secrecy and indirection are, therefore, wholly inconclusive circumstances. They are as consistent with a lawful expedition designed to transport men peaceably to Cuba for the simple purpose of enlistment there, as they are with the existence of a hostile expedition. Thus all the circumstances that attend such an enterprise make it difficult for the government to prove its charge. This is inherent in the nature of the case, because of the necessity that exists even for a lawful expedition, such as I have described, to work in secrecy.

In passing, I may observe in regard to the clearing of the Bermuda for Santa Marta, and the false oath which seems to have been made by the master a few hours before this seizure, that that false oath is equally inconclusive. That is a separate offense, not on trial here; and it was an act evidently done for the same purpose of keeping secret the taking of passengers, and the nature of the intended cargo, in case you find the vessel was destined to carry the arms and men to Cuba. It was an incident, therefore, of the same kind as all the other secret means taken to prevent the knowledge of the expedition from reaching the Spanish authorities and thus subjecting the expedition to greater danger.

I shall not go over the various circumstances in the case upon which reliance is placed to lead you to a conviction that there was a military expedition. If I have made myself understood, I think you appreciate sufficiently what the court understands to be a military expedition, as distinguished from a peaceful and a lawful one. I only repeat that while it is not necessary in my judgment that all the elements of a military expedition—soldiers, officers, a military organization, arms and equipments—should exist or be supplied at the time when the vessel sails, it is necessary that there should be a combination for those purposes, that these should have been within the understanding and intent of the parties and that some of these things should be consummated here. The most essential thing would seem to be a combination for some kind of military organization, some enrollment, some enlistment, or some agreement which bound the men to act together as a body for military service. If

this agreement existed, other things might be supplied afterwards before the scene of action was reached.

In the present case these men as a body were not armed, as appears to the court, in any such manner as would be effective, nor as would be probable, in case they were designed for military service before they reached Cuba. A few side arms, a pistol and a belt for a few men, or a sword and belt for a small portion of the men, do not constitute such an arming of a body of men as you would expect in case that body was designed to act as a military force.

A good deal of stress is laid upon the evidence of enrollment. It is for you to judge what interpretation you shall give to the circumstances that have been proved in that regard. I think there is only one witness, De Villar, and only one piece of evidence in the whole case, that tends to show any military combination. He says that when he first went to Garcia, after a few moments conversation Garcia said he did not want him. On a second visit, after some five or ten minutes, he finally said he would take him, and that the witness signed a paper with other names upon it, at Garcia's request. When the witness was called on the second day, changing somewhat the testimony which he gave on the first day, he said that other men were there who signed the paper and that the paper was pointed out on the table by the other men who told him to sign it; the first day he said Garcia told him to sign it, and he did so. The first day he said he did not know what the paper was, except that there were two or three leaves containing names after the heading; that he did not know what the heading was, and did not read it. On the last day, he says he recalls that he saw the words in the heading, "Soldiers Incorporated in the City of New York for the Independence of Cuba"; and that although the heading was in writing, about three inches long on the page, he did not read the rest of it, and did not try to read it, nor was it read aloud. It is unfortunate that we have nothing more of this heading. It is always dangerous to judge by a small part of a written instrument. How can we tell what the other provisions were; or what qualifications were placed upon the words quoted, or what agreement there was by the men signing it, if there was any agreement? The court was in doubt, for that reason, whether this piece of testimony should be admitted at all. If, however, you interpret the words quoted by what De Villar says he did, by what he understood, and by what he says he expected to do, you would apparently find some qualification of what these words quoted might import. On cross-examination he says that what he expected to do was to go to Cuba to enlist in the Cuban army. If that is correct, it would indicate that he did not understand that he was enlisted in the Cuban army here. Again, from his actions and conduct, and from the way he testifies there does not seem to have been any understanding on his part that his signature put him under pay. Whether the heading said anything about pay, we do not know. The way he got money from Almazor seems accidental. He speaks of it as if he had not expected it, and as if there was no

contract about it. He says that Hernandez, his friend at the same boarding house, told him that some others were getting money from Almazor, and if he would go there he would get it; that he went there and got $5 twice before the Hawkins sailed; and that after the Hawkins was lost, and before the expedition on the Bermuda, he got $5 from Almazor for two or three of the last weeks.

Now it is for you to determine, whether there was any enlistment of men for pay; whether what De Villar says that he did, and what he expected to do do not indicate rather what was the real purpose of this expedition. He had no conversation, and no agreement with any others of the men. There seems to be no evidence of any common understanding except such as might be inferred from what he says about this paper, which he says quite a number signed; and the purpose of the paper may be inferred from what he says he did, and expected to do.

Whether there were officers or any relation of soldier and commander, there is almost an entire dearth of evidence. I do not recall any evidence to show that there was any officer whatsoever; not even that Garcia was an officer, or was connected with the insurgent army. If there was, you will give it its weight. De Villar called himself "under the hand" of Almazor. Whether that was anything more than simply looking after certain men who had arranged to go to Cuba, you must judge. Almazor conducted De Villar and six others to the Hawkins; and in like manner De Villar took in charge seven men for the purpose of taking them down to the Atlantic Basin, where the tug McCaldin Brothers received them on board for the purpose, as you may find, of embarking on the Bermuda. I think there is no other evidence of direction or command than what may be inferred from that. It is for you to say whether that imports any military command, or whether it is anything more than looking after a certain number of men who had signed their names as willing to go to Cuba, and keeping track of them and getting them on board the proper vessels to go there when the time came.

In regard to the ammunition which was on board the Stranahan and which never reached the Bermuda, it is for you to draw your inferences, whether that was in fact designed for the Bermuda or not. If it was, then you are to consider whether the evidence indicates that it was to be transported peaceably as merchandise to Cuba, possibly for the benefit of the insurgent army; or whether it was for the purpose of aiding in a hostile attack and invasion on the part of this body of men who were to embark on board the Bermuda, or was a part of a military enterprise. If you find that the circumstances warrant you in believing that the body of men who embarked and those who intended to embark upon the Bermuda, were designed to constitute, or to act as a military body before they joined the insurgent army, the presence of arms on board the Bermuda, and the furnishing of them in some way would be extremely important. Proper arms would be a necessary adjunct and attendant on any such design on the part of the men embarking, unless they were to obtain arms from some other source; be-

cause, as I have said, in the condition in which they embarked they were not prepared, they were not equipped, they were not armed so as to be of any substantial use for military service. It is incredible that an expedition designed for any military service of its own should be sent out without other arms than what they had personally about them, unless a further supply of arms was planned.

On the other hand, if you find that there was no intention or design on the part of this embarking body to act as a military body, or to exercise any military force as a body in getting to Cuba, and if you find that they had not joined the Cuban army here, so as to become incorporated with it, and were not to be transported from here as a part of the insurgent army, then the presence of these munitions of war on the Bermuda would be unimportant.

I must advert briefly to some general rules of law applicable to your consideration of the evidence. I should first say, however, that unless you find these defendants or some of them were a part of the body designed to be a military expedition, you cannot find them guilty unless you find not only that there was a military expedition, but that the defendants had knowledge of it, and assisted it.

The evidence as affecting Mr. Hart is that he was instrumental in the purchase of the Bermuda, ostensibly for the fruit trade, and that she cleared for a fruit port. He furnished some money in payment of the price of her, and Mr. Guerra furnished the larger part. Both of these men were on the tug that brought Garcia down to the Bermuda. If you find there was a military expedition, their association with Garcia,—who, upon the evidence, must have been a chief instrument in planning and arranging it,—and their presence with Garcia when he came down to the Bermuda that night, and when Hart went aboard, would be a pretty strong circumstance from which you might infer their acquaintance with his unlawful design, though that would not necessarily follow. I believe there is no other evidence than that single circumstance. It is for you to say whether that is sufficient. Neither Guerra nor Hart seems to have been in any other way identified with this body of men. If it was military in character, Guerra and Hart cannot be convicted unless they understood it; and unless the purchase of this vessel and the use of it for those men and for that purpose was known by them.

Brabazon and Bueno stated to the government officers their knowledge that there was to be a transportation of men to Cuba for the insurgent army. Further than that I do not understand the testimony of Mr. Bagg to go upon that point. Bueno designed to enlist there, to fight in the Cuban army. Brabazon knew this general purpose.

In regard to all this evidence, how, upon weighing it, you are to act in view of any uncertainties you may feel, is governed by the maxim in criminal cases, that if there is a reasonable doubt on the whole evidence with regard to the guilt of the accused, you must give him the benefit of the doubt. You must be satisfied beyond a reasonable doubt of the guilt of the accused, and of the existence of those facts, and each of them, which you deem essential to the finding of guilt. And as to the various elements of a military expedition to

which I have referred, and the intention, if in any of them you think there is such reasonable question as to lead you to a reasonable and substantial doubt, it is your duty to give the defendants the benefit of that doubt. By that is not meant a mere possibility of a different opinion; nor the mere shadow of a doubt. It is to be a doubt based upon a reasonable consideration of all the circumstances, a reasonable and sensible view of the whole situation.

Another point that I should mention in connection with the testimony of De Villar, and which I have been asked to charge is, that upon his own testimony, if there was a military expedition, he stands in the situation of an accomplice, testifying for the state; and that his evidence given in that character is to be looked upon with suspicion. It may all be true, but you criticise it. You apply tests freely. If you find it corroborated by circumstances which seem to make it probable, you accept it as probably true. In matters where it would seem improbable, if you do not find it corroborated, you should not act upon that alone. The testimony of accomplices, being viewed with suspicion, ought to find some corroboration. The government does not intend to rely, and does not ask a jury to convict defendants upon the mere testimony of accomplices. It is for you to say to what extent you find De Villar's testimony corroborated; and if you do find it corroborated, then in this case, as in all others, the testimony of an accomplice may be extremely valuable, because it may explain naturally and easily the other evidence so as to enable you to reach an undoubted and rational conclusion. It is for you to say whether De Villar's testimony is thus corroborated in its essential particulars; and to what extent his own testimony supports the contention that a military expedition was designed on the part of the men who embarked.

I am also requested to charge you, as I do, that the failure of the defendants to testify in this case is in no degree to be imputed against them. They may rely entirely on the ability of the government to make out a case against them; and when they or their counsel consider that no case is made, and they do not go on the stand as witnesses, that circumstance is to be wholly disregarded, and is in no way to be taken to their prejudice. You judge by the testimony given whether the accusation is made out or not. The burden of proof from the beginning is upon the government, to establish before you the fact of guilt by credible testimony, and beyond reasonable doubt.

If you find the circumstances relied on to show guilt are as compatible with the theory of innocence or of an innocent undertaking as with the theory of a prohibited undertaking, it is your duty to find for the defendant. The very fact that the circumstances are compatible with an innocent undertaking makes a situation of doubt and reasonable doubt, the benefit of which you give to the prisoner.