## THE THREE FRIENDS.

### UNITED STATES v. THE THREE FRIENDS.

(District Court, S. D. Florida.   January 18, 1897.)

#### No. 131.

**1. NEUTRALITY LAWS—FORFEITURE OF VESSEL.**
Under Rev. St. § 5283, forbidding the fitting out and arming of a vessel with intent that she be employed against a government with which the United States are at peace, no prior personal conviction of an offender is necessary to warrant a decree of forfeiture in rem against the vessel.

**2. SAME.**
This section, by forbidding the fitting out and arming of a vessel with intent that she·shall be employed in the service of any foreign prince or state, "or of any colony, district, or people," refers to a body politic, which has been recognized by our government at least as a belligerent; and the section does not apply to the case of a vessel fitted out and armed to be employed in the service of insurgents or persons never recognized as a political body by our government.

This was a libel of forfeiture filed by the United States against the steamer Three Friends for alleged violation of the neutrality laws. A motion for permission to give bond for the release of the vessel was heretofore granted.   78 Fed. 173.   The cause is now heard upon exceptions to the libel.

A. W. Cockrell, for claimant.
Frank Clark, U. S. Atty., and Cromwell Gibbons, Asst. U. S. Atty.

LOCKE, District Judge.   This vessel has been libeled for forfeiture under the provisions of section 5283 of the Revised Statutes of the United States.   The libel alleges that said steam vessel was on the 23d day of May, A. D. 1896, furnished, fitted, and armed "with intent that she should be employed" by "certain insurgents or persons in the Island of Cuba to cruise or commit hostilities against the subjects, citizens, or property of the said Island of Cuba, and against the king of Spain and the subjects, citizens, and property of the said king of Spain in the Island of Cuba with whom the United States are and were at that date at peace."   To this there have been exceptions filed upon two grounds:   (1) That forfeiture under this section depends upon the conviction of a person or persons for doing the acts denounced; and (2) that the libel does not show that the vessel was armed or fitted out with the intention that she should be employed in the service of a foreign prince or state, or of any colony, district, or people recognized or known to the United States as a body politic.

The first objection raised by these exceptions is easily disposed of by the language of the supreme court in the case of The Palmyra, 12 Wheat. 1, where, after elaborate argument, it is said:

"Many cases exist when the forfeiture for acts done attaches solely in rem, and there is no accompanying penalty in personam.   Many cases exist where there is both a forfeiture in rem and a personal penalty.   But in neither class

of cases has it ever been decided that the prosecutions were dependent upon each other. But the practice has been, and so this court understands the law to be, that the proceeding in rem stands independent of, and wholly unaffected by, any criminal proceeding in personam. * *. * In the judgment of this court no personal conviction of the offender is necessary to enforce a forfeiture in rem in cases of this nature." ·

The other question raised by the exceptions is more difficult, and requires a construction of the clause of section 5283, "with intent that such vessel should be employed in the service of any foreign prince or state, or of any colony, district, or people," and more particularly the significance of the words "colony, district, or people," and a determination whether the requirements of the law are satisfied by the allegations of the libel that the vessel was intended to be employed "in the service of certain insurgents or persons in the Island of Cuba"; and whether the statute admits a construction which would make a vessel liable to forfeiture when fitted out for the intended employment of any one or more persons not recognized as a political power by the executive of our nation. The section under which this libel has been filed was originally the third section of the act of June 5, 1794 (1 Stat. 381, c. 50), and the language at that time only contained the provision that the vessel should be fitted out with intent that said vessel should be employed in the service of any foreign prince or state, to cruise or commit hostilities against the subjects, citizens, or property of any foreign prince or state with whom the United States might be at peace. While that was the language of the act, the question came before the supreme court in the case of Gelston v. Hoyt, 3 Wheat. 328, and in speaking of a plea considered necessary for a defense to a suit for damage for this seizure under this statute it was held that such plea was bad, "because it does not aver the governments of Petion and Christopher are foreign states which have been duly recognized as such by the government of the United States." In this case there was no distinction made between the party in whose service the vessel was to be employed and the one against whom hostilities were intended, and the language of the court would fully justify the conclusion that they should both have been recognized, either as princes or states. Subsequently, as is stated by Mr. Wharton in his work on International Law, upon the outbreak of war between the South American colonies and Spain, upon a special message of President Madison to congress upon the subject, the words "or of any colony, district, or people" were added to the description of both parties contemplated,—both that one into whose employment the vessel was to enter and that one against whom the hostilities were contemplated. Has the addition of these words changed the character of the party intending to employ such vessel from that of a political power duly recognized as such, as is declared by the court in Gelston v. Hoyt, to that of a collection of individuals without any recognized political position? This question has been before the courts frequently, and several times been examined and commented upon; but in no case which I have been able to find has it been so presented,

unconnected with questions of fact, that there has been a ruling upon it so that it can be considered as final and conclusive. Beyond question the courts are bound by the actions of the political branch of the government in the recognition of the political character and relations of foreign nations, and of the conditions of peace or war. The act of 1794, as well as its modification, the act of 1818, used the same language in describing the power or party in whose behalf or into whose service the vessel was intended to enter as was used in describing the political power against which it is intended that hostilities should be committed; and, as far as the language itself goes, it is impossible to say that in using the words in one clause of the sentence the political character and power were intended, while in another clause of the same sentence words used in exactly the same connection, and with apparently the same force and meaning, were intended to represent not the political power, but the individuals of a certain colony, district, or people.

It is contended that, although the original act of 1794 required the construction given it in Gelston v. Hoyt, that each party should be one duly recognized by the United States, yet the modification of 1818 so changed it that it could be held to apply to any persons, regardless of their political character, for whose service a vessel might be intended. It is understood that this modification was brought about by the special message of President Madison of December 26, 1816. The question presented by this message is clearly set forth in the language used. He says:

"It is found that the existing laws have not the efficacy necessary to prevent violations of the United States as a nation at peace toward belligerent parties, and other unlawful acts on the high seas by armed vessels equipped within the waters of the United States."

In further explanation of the condition of affairs which called for this modification of this statute may be considered the letter of Mr. Monroe, secretary of state, to Mr. Forsythe, January 10, 1817, in which he speaks of vessels going out as merchant vessels and hoisting the flag of some of the belligerents, and cruising under it; of other vessels armed and equipped in our ports hoisting such flags after getting out to sea; and of vessels having taken on board citizens of the United States, who, upon the arrival at neutral points, have assumed the character of officers and soldiers in the service of some of the parties in the contest then prevailing. All of this correspondence shows that the effort at that time was to enforce neutrality between recognized belligerent parties. That the parties then in contest were recognized as belligerents, and a neutrality was sought to be preserved, is clearly shown by the first annual message of President Monroe in 1817. He says:

"Through every stage of the conflict the United States have maintained an impartial neutrality, giving aid to neither of the parties in men, money, ships, or munitions of war. They have regarded the contest not in the light of an ordinary insurrection or rebellion, but as a civil war between parties nearly equal, having as to neutral powers equal rights. Our ports have been open to both, and any articles * * * that either was permitted to take have been equally free to the other."

78 F.—12

It is considered that this shows what was in contemplation at the time of the enactment of the law of 1818, and that what was intended was to prevent the fitting out of vessels to be employed in the service of a colony, district, or people which had been recognized as belligerents, but which had not been recognized as an independent state, or which was not represented in the political world by a prince.    There appears to be nothing in the remedy demanded at that time, or in the language used, to show that the words so added were intended to represent or be construed as referring to the individual people of any colony, district, or people, or any number of them, however designated, except as in their collective, representative, political capacity, any more than there is to show that the term "state" in the original was intended to refer to the individual people of the state.    The language of the foreign enlistment act of Great Britain (59 Geo. III. c. 69, § 7) leaves no question as to the intention of parliament in that legislation, as it added to the words of our statute the words, "or part of any province or people or of any person exercising or assuming to exercise any powers of government in or over any foreign state, colony, province or parts of any province or people."    In order to give the statute under which this libel is brought the force contended for by the libelant it is necessary to eliminate from the provision that makes it necessary to declare how the vessel is to be employed the entire clause, "in the service of any foreign prince or state or of any colony, district, or people," or to read into it the language found in the act of Great Britain, or its equivalent.    That it was the general understanding at the time of the passage of the original act that it was considered to apply only to duly-recognized nations is shown by the fact that in the case of U. S. v. Guinet, 2 Dall. 321, Fed. Cas. No. 15,270, under this same section (the first case brought under it), the indictment alleged fully in terms that both the state of the republic of France, in whose service the vessel was to be employed, and the king of Great Britain, were a state and a prince with whom the United States was at peace.    In the case of U. S. v. Quincy, 6 Pet. 445, the supreme court says that the word "people" was used in this statute as simply descriptive of the power in whose service the vessel was intended to be employed, and is one of the denominations applied by the acts of congress to a foreign power.    In the case of The Meteor, Fed. Cas. No. 9,498, where the original libel alleged that the vessel was fitted out with the intent that she should be employed in the service of certain persons to commit hostilities against the government of Spain, it was considered necessary to amend it by alleging that she was intended to be employed by the government of Chili, and in that case there was presented a certificate of the secretary of state, under seal, of the fact of the war existing between Spain and Chili, and that they were both nations with whom the United States were at peace.

In addition to the declaration of the supreme court in the cases of Gelston v. Hoyt, and U. S. v. Quincy, this question has been in-

cidentally under examination in several cases in the lower courts. In the case of The Carondelet, 37 Fed. 800, Judge Brown says:

"Section 5283 is designed in general to secure our neutrality between foreign belligerent powers. But there can be no obligation of neutrality except towards some recognized state or power de jure or de facto. Neutrality presupposes two belligerents at least, and, as respects any recognition of belligerency,—i. e. of belligerent rights,—the judiciary must follow the executive. To fall within the statute, the vessel must be intended to be employed in the service of one foreign prince, state, colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of another with which the United States are at peace. The United States can hardly be said to be at peace in the sense of the statute, with a faction which they are unwilling to recognize as a government; nor could the cruising or committing of hostilities against such a mere faction well be said to be committing hostilities against the subjects, citizens, or property of a district or people, within the meaning of the statute. So, on the other hand, a vessel, in entering the service of the opposite faction of Hippolyte, could hardly be said to enter the service of a foreign prince or state, or of a colony, district, or people, unless our government had recognized Hippolyte's faction as at least constituting a belligerent, which it does not appear to have done."

In the case of The Conserva, 38 Fed. 431,—a case in which it was alleged the vessel was to be used in a contest between Legitime and Hippolyte,—Judge Benedict says:

"The libel in this case charges certain facts to have been done in connection with the vessel with the intention that the vessel be employed in the service of certain rebels in a state of insurrection against the organized and recognized government of Hayti, to cruise and commit hostilities against the subjects, citizens, or property of the republic of Hayti, with whom the United States are at peace. A violation of the neutrality which the United States are obliged to maintain between the rebels mentioned and the government of the republic of Hayti is the gravamen of the charge. But the evidence fails to show a state of facts from which the court concluded that the United States were ever under any obligation of neutrality to the rebels mentioned, or are now under any obligation of neutrality to the government of the republic of Hayti."

In the case of U. S. v. Trumbull, 48 Fed. 99, Judge Ross carefully reviews the different authorities, examines the question, and clearly indicates how he would have decided the question had it been necessary for the purpose of deciding the case before him. He says:

"Does section 5283 of the Revised Statutes apply to any people whom it is optional with the United States to treat as pirates? That section is found in the chapter headed 'Neutrality,' and it was carried into the Revised Statutes, and was originally enacted in furtherance of the obligations of the nation as a neutral. The very idea of neutrality imports that the neutral will treat each contending party alike; and it will accord no right or privilege to one that it withholds from the other, and will withhold none from one that it accords to the other."

In speaking of the case of U. S. v. Quincy, in which it was said that the word "people" "was one of the denominations applied by the act of congress to a foreign power," he says:

"This can hardly mean an association of people in no way recognized by the United States or by the government against which they are rebelling, whose rebellion has not attained the dignity of war, and who may, at the option of the United States, be treated by them as pirates."

In the case of U. S. v. The Itata, 5 C. C. A. 608, 56 Fed. 505, on appeal before the circuit court of appeals, the question was fully

and carefully considered in an elaborate opinion, and, although not found necessary to decide the question in this case, as the case was disposed of upon other grounds, it is considered to be apparent how the question would have been decided had it been necessary. The force of the word "people" as used in this statute is carefully examined, as well as all other questions, and it is considered that the force of the conclusion which must necessarily result from such investigations cannot be avoided.

In the case of U. S. v. Hart, 74 Fed. 724, Judge Brown expresses his view of this section by saying:

"Section 5283 deals with armed cruisers, designed to commit hostilities in favor of one foreign power as against another foreign power with whom we are at peace."

The same language is used by the court in the case of Wiborg v. U. S., 163 U. S. 632, 16 Sup. Ct. 1127, 1197; but it is contended in behalf of the libelant that this language was modified by the subsequent declaration, made in the same case, that the operation of this statute is not necessarily dependent on the existence of such state of belligerency. In using the latter language it would seem that the court had the entire statute under contemplation, and more particularly section 5286, Rev. St. (the sixth section of the original act), which plainly does not depend upon a state of belligerency or neutrality. This was the section then under consideration, as the immediate context and following sentence show, and was the section upon which the suit was based; and it cannot be considered that this language was intended to apply to another section, the construction of which was in no way called in question.

With this understanding of the language in that case, every judicial decision, remark, or ruling, where the question has been under consideration or examination, appears to be in favor of the position taken by the claimants in the exceptions. In the case of The Mary N. Hogan, 18 Fed. 529, and in the cases of the intended charge of that vessel, Boxes of Arms and Ammunition, 20 Fed. 50, it does not appear that this question was raised by the claimant or considered by the learned judge; and his language in the subsequent case of The Carondelet, where it was raised and discussed, may be accepted as presumptive proof of what his decision would have been had it been so considered. The same is true of the case of The City of Mexico, 28 Fed. 148, decided by me in this court. In that case the defense was upon entirely different grounds, and the force of the portion of the statute contended for—the necessity that there should be an intent not only that the vessel should be intended to commit hostilities, but that for such purpose she should be employed in the service of some political power—was entirely lost sight of and eliminated from the consideration of the case.

The only expression authoritatively given which I have been able to find opposed to the view of the claimant in his exceptions is that of a portion of the letter of the honorable attorney general to the secretary of state of December 16, 1869 (13 Op. Attys. Gen. U. S.

177), and cited in the case of Wiborg v. U. S. I do not consider that I should be doing myself justice to pass that by unnoticed, as it has raised more question in my mind, and called for and compelled more thought and consideration, than anything else connected with the case; but I feel compelled to reach a different conclusion than is there expressed. The general purpose and intent of that letter was to declare that the insurrection in Cuba was not a fitting opportunity to enforce the provisions of this law, inasmuch as we owed no duty to such insurgents to protect them from hostilities, or, rather, that any contest between Spain and such insurgents could not be considered as hostilities; but incidentally it was stated that a condition of belligerency was not necessary for the operation of this statute. It could not be considered that we owed such insurgents no such duty because we were not at peace with them, but because we had never recognized them as a colony, district, or people. The force and effect of the letter was that the Cuban insurgents had not been recognized as a colony, district, or people, and therefore this section did not apply. If they had not been then so recognized, or were not entitled to be so recognized, how can they now be so recognized or described as to come within terms of the statute in question? It is considered that the argument used in such letter to show that the statute should be held applicable to cases where there was no condition of belligerency, and but one political power recognized, would have been fully as applicable under the old law, when the case of Gelston v. Hoyt decided to the contrary. The fact that a vessel was fitted out to be employed in the service of a prince would not necessarily imply that such prince was a political power recognized by the United States any more than would the terms a "colony, district, or people," under the act of 1818. But the supreme court clearly held in that case that it must be alleged that such prince or state has been recognized as such by the United States. The same argument used therein would call for the application of this statute for the purpose of forfeiting any vessel fitted out to be employed by any person, individual, corporation, or firm for the purpose of committing hostilities against a state at peace, which would plainly not come within the provisions of the statute, however much it might be considered international policy or proper national conduct.

It is impossible, in my view of the construction required by the language used, to properly apply the term "a people," used in the connection in which it is found, to any persons, few in number, and occupying a small territory, with no recognized political organization, although they might procure the fitting out and arming of a vessel. I fail to find any grounds for giving this statute—a criminal one as it is—any but its ordinary application. The question presented is clear and distinct, are "certain insurgents or persons in the Island of Cuba" properly described by either of the terms a "colony, a district, or a people"; and, if so, which? The inconveniences which might arise from the political branch of our government rec-

ognizing such insurgents as a colony, district, or people having political existence, and as belligerents, cannot be considered in determining whether they are entitled to such description. This statute is a criminal and penal one, and is not to be enlarged beyond what the language clearly expresses as being intended. It is not the privilege of courts to construe such statutes according to the emergency of the occasion, or according to temporary questions of policy, but according to principles considered to have been established by a line of judicial decisions.

It is contended that if the principles embodied in the exceptions are declared to be the law, there can be no law for the prevention of the fitting out of armed and hostile vessels to stir up insurrections and commit hostilities against nations with which we are at peace; and that such conclusion would make the parties engaged in any such expedition liable to prosecution as pirates. In regard to the first of these points, it is considered that section 5286 is, as has been constantly held, intended to prevent any such expeditions, regardless of the character of the parties in whose behalf they were organized; the only distinction being that in that case it is necessary to bring a criminal suit, and prove overt acts, while under this portion of this section the intent is the gravamen of the charge, and the prosecution is against the vessel, regardless of the persons engaged in the fitting out, or the ignorance or innocence of the owners. This is not a case that can be or should be determined upon questions of public policy, and whether any parties subject themselves to prosecution for piracy or not should have no weight in its consideration. If they should be so subject, they would have the benefit of the necessity of proving piratical acts rather than intentions. It is certainly considered to be true that any such parties would be considered as pirates by Spain, and would be treated as such if found in any acts of hostility, regardless of any recognition this nation might give them by considering them as having any political character as a people.

Without attempting further argument, but regretting that the pressing duties of a very busy term of jury trials have prevented a fuller and more complete expression of my views, it is my conclusion that the line of judicial decisions demands that a construction should be put upon the section in question which would hold that it was the intention of congress in such enactment to prevent recognized political powers from having vessels prepared for their service in the United States; but that it was not the intention to extend such prohibition to vessels fitted out to be employed by individuals or private parties, however they might be designated, for piratical or other hostilities, where no protection could be obtained by a commission from a recognized government. In such case they would be held liable under the section which provides for the fitting out of a military expedition; or, if they were guilty of any piratical acts upon the high seas, they would become liable under the laws for the punishment of such acts. It is considered that at the time of the

amendment of 1818 this construction had been declared, and the language of the amendment was in no way intended to change such construction, but was only intended to apply to the new designation of political powers the existence of which had been recognized as belligerents, if not as independents, and who were entitled to the rights of neutrals; that the libel herein does not state such a case as is contemplated by the statute, in that it does not allege that said vessel had been fitted out with intent that she be employed in the service of any foreign prince or state, or of any colony, district, or people recognized as such by the political power of the United States, and, unless it can be so amended, should be dismissed; and it is so ordered.

Since writing the foregoing, the libel herein has been amended by inserting in place of "by certain insurgents or persons in the Island of Cuba" the words, "in the service of a certain people, to wit, certain people then engaged in armed resistance to the government of the king of Spain, in the Island of Cuba"; but it is considered that the objection to the libel in sustaining the exceptions has not been overcome, but that, although the language has been somewhat changed, the substance has not been amended in the material part, inasmuch as it appears clearly that the word "people" is used in an individual and personal sense, and not as an organized and recognized political power in any way corresponding to a state, prince, colony, or district, and can in no way change my conclusions heretofore expressed; and the libel must be dismissed.